Joseph CURRAN, Individually and on Behalf of all the Members of the National Maritime Union of America, AFL–CIO, Appellant,

v.

Melvin R. LAIRD et al., Appellees.

No. 21040.

United States Court of Appeals District of Columbia Circuit.

Reargued June 20, 1969.

Decided Nov. 12, 1969.

J. Skelly Wright, Circuit Judge, Bazelon, Chief Judge, and Spottswood W. Robinson, III, Circuit Judge, dissented in part.

Mr. Martin J. Vigderman, Philadelphia, Pa., with whom Mr. Abraham E. Freedman, Philadelphia, Pa., was on the brief, for appellant. Mr. Stephen C. Sussman, Philadelphia, Pa., also entered an appearance for appellant.

Mr. Alan S. Rosenthal, Attorney, Department of Justice, with whom Mr. David G. Bress, U. S. Atty., at the time the brief was filed, was on the brief, for appellees. Messrs. Richard S. Salzman and Norman Knopf, Attys., Department of Justice, also entered appearances for appellees.

### ON REHEARING EN BANC.

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON and ROBB, Circuit Judges, sitting en banc.

LEVENTHAL, Circuit Judge:

This case involves an action brought by the President of the National Maritime Union, on behalf of all members of that union, against United States officials responsible for the shipment of American military cargo. Appellant seeks enforcement of the Cargo Preference Act. This statute, passed in 1904, and reenacted in the codification law of

August 10, 1956, provides as follows, *see* 10 U.S.C. § 2631 (1964):

Only vessels of the United States or belonging to the United States may be used in the transportation by sea of supplies bought for the Army, Navy, Air Force, or Marine Corps. However, if the President finds that the freight charged by those vessels is excessive or otherwise unreasonable, contracts for transportation may be made as otherwise provided by law. * * *

It is undisputed that the Military Sea Transportation Service (MSTS) has used foreign flag ships to transport American military cargo to Vietnam. The Government replies that foreign vessels were not used while operating American bottoms were available. It also defends the action on various legal grounds.

After receiving depositions and affidavits the District Court granted summary judgment for appellees. We agree that appellant Curran has standing, in behalf of the members of the National Maritime Union (NMU), to bring this action. However, we reject appellant's several contentions on the merits. Accordingly we affirm.

## I. STANDING

The Government argues that neither the NMU nor its members have standing to complain in court of a violation of the Cargo Preference Act.

Plainly the NMU, representing the interests of its members, is aggrieved in fact by the allegedly unlawful action of the Secretary of Defense. A requirement that the Secretary use American flag vessels will expand employment opportunities for the members of the NMU, who man those vessels.[1]

Aggrievement in fact presents the kind of concrete, adversary interest underlying the recent decisions rejecting objections to standing, especially in the constitutional sphere.[2] It establishes "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination" of difficult and far-reaching questions. Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). It is also significant in determining the existence of standing to seek a mandate for enforcement of a statutory provision, though we agree with the Government that is not decisive.[3] Section 10 of the Administrative Procedure Act[4] makes cross-reference to the legislative trend of enacting statutes that provide standing to persons aggrieved in fact. *E. g.*, FCC v. Sanders Bros., 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940). Under the liberal approach developed by the Supreme Court, a person's ability to vindicate his statutory rights permits an action attacking broad regulation claimed inconsistent with the statute, even though complainant is not now or imminently engaged in or proposing activities interdicted by the regulation, provided his ability to undertake cogent planning of his present or future operations is in-

1. The relevant statutory provision is discussed below, note 11 and text thereto. The complaint alleges (par. 14) that use of foreign flag vessels operates to the prejudice of American seamen. The Government's motion for summary judgment does not deny prejudice in fact, but upholds the legality of official actions and denies standing to complain of illegality.

2. *Compare* Frothingham v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923) *with* Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); Tileston v. Ullman, 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603 (1943) *with* NAACP v. Button,

371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).

3. Kansas City Power & Light Co. v. McKay, 96 U.S.App.D.C. 273, 225 F.2d 924, cert. denied, 350 U.S. 884, 76 S.Ct. 137, 100 L.Ed. 780 (1955); Arnold Tours, Inc. v. Camp, 408 F.2d 1147 (1st Cir. 1969); Jaffe, Judicial Control of Administrative Action, 528–530 (1965).

4. 5 U.S.C. § 702 (1964): "Right of review. A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."

hibited. United States v. Storer Broadcasting Co., 351 U.S. 192, 200, 76 S.Ct. 763, 100 L.Ed. 1081 (1956). The Legislature's additional provision, that any person suffering legal wrong because of agency action is entitled to judicial review, confirms and strengthens the doctrine whereby courts have found standing on the basis of a legally protected interest. The statute's expansion of judicial review intermeshes with and reenforces a judicial trend liberalizing standing through discernment of a protected interest. The general line of development is underscored by the observation of Justice Harlan in Abbott Laboratories v. Gardner, 387 U.S. 136, 140–141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967):

> [A] survey of our cases shows that judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress. * * * Early cases in which this type of judicial review was entertained, *e. g.* Shields v. Utah Idaho Central R. Co., 305 U.S. 177, 59 S.Ct. 160, 83 L.Ed. 111; Stark v. Wickard, 321 U.S. 288, 64 S.Ct. 559, 88 L.Ed. 733, have been reinforced by the enactment of the Administrative Procedure Act, which embodies the basic presumption of judicial review to one "suffering legal wrong because of agency action or adversely affected or aggrieved by agency action within the meaning of a relevant statute," 5 U.S.C. § 702, so long as no statute precludes such relief or the action is not one committed by law to agency discretion, 5 U.S.C. § 701(a). The Administrative Procedure Act provides specifically not only for review of "Agency action made reviewable by statute" but also for review of "final agency action for which there is no other adequate remedy in a court," 5 U.S.C. § 704. The legislative material elucidating that seminal act manifests a congressional intention that it cover a broad spectrum of administrative actions and this Court has echoed that theme by noting that the Administrative Procedure Act's "generous review provisions" must be given a "hospitable" interpretation. * * * Again in Rusk v. Cort, 369 U.S. 367, 82 S.Ct. 787, 7 L.Ed.2d 809, *supra,* at 379–380, 82 S.Ct. at 794, the Court held that only upon a showing of "clear and convincing evidence" of a contrary legislative intent should the courts restrict access to judicial review. *See also* Jaffe, Judicial Control of Administrative Action 336–359 (1965). [Footnote omitted.]

*The area where the judicial liberalization of standing has made least headway relates to actions by one competitor complaining of another's lack of authority. In this context the courts have been reluctant to find standing "because of the policy encouraging free and open competition—a policy that favors competition in the market place, not in the courts." [5] Yet even here there have been decisions upholding standing in a competitor upon "an indication of Congressional intent, explicit or implicit, in the relevant substantive acts to grant protection to the competitive interest * * *." [6]*

In the recent case of Hardin v. Kentucky Utilities Co., 390 U.S. 1, 88 S.Ct. 651, 19 L.Ed.2d 787 (1968), the Court upheld the standing of a private utility to challenge the legality of TVA's activities in expanding its area of sales. The Court restated the general rule "that the economic injury which results from lawful competition cannot, in and of itself, confer standing on the injured business to question the legality of any aspect of its competitor's operations." But the Court stressed that another rule, established at least since the *Chicago Junction Case,* 264 U.S. 258, 44 S.Ct. 317, 68 L.Ed. 667 (1924), made it plain that even a competitor had standing to complain of non-observance of a statutory provision that reflected "a legislative purpose to

---

5. *See* Arnold Tours, Inc. v. Camp, 408 F.2d 1147, 1149 (1st Cir. 1969).

6. *See* Arnold Tours, Inc v. Camp, 408 F.2d 1147, 1150 (1969).

protect a competitive interest." (390 U. S. at 6, 88 S.Ct. at 654.)

The reference to "a legislative purpose" is not a requirement that this be the principal purpose of the legislature. This is also the analysis of the *Chicago Junction Case* presented by Professor Jaffe,[7] whose approach, it will be noted, was cited with approval by Justice Harlan in *Abbott Laboraories*.

A number of precedents have been cited to us. The Government relies especially on Kansas City Power & Light Co. v. McKay, 96 U.S.App.D.C. 273, 225 F.2d 924, cert. denied, 350 U.S. 884, 76 S.Ct. 137, 100 L.Ed. 780 (1955), and other pre-*Hardin* precedents of this court denying standing.[8]

In *Hardin* the Supreme Court limited the significance of our *McKay* decision. Our view, that the "long established doctrine" concerning actions by competitors meant that an explicit statutory provision was necessary to confer standing on a competitor, was held wholly inapplicable to actions by competitors to enforce statutory requirements concerned with protecting competitive interests. *See* 390 U.S. at 7, 88 S.Ct. 651.

The post-*Hardin* opinions have appeared for the most part in cases involving competitors protesting broadened activities of national banks. While the results are by no means uniform, there seems to be a trend toward recognition of standing accompanied by avowals of difficulty.[9]

■ There is little to be gained from examination of the precedents in detail. Obviously no simple touchstone can be provided for determination of standing questions. Each case turns on the nature of the parties, the grievances and the statutory provisions involved. However, it is clear that with the approach charted in *Abbott Laboratories*, a person aggrieved in fact may properly invoke not only the letter of the Administrative Procedure Act and its "generous" review provisions, but a broad conception that Congress is "hospitable" to the maintenance of complaints against officials charged with disregarding its substantive mandate. And it does appear that in the absence of a contrary indication the courts will entertain even an action brought by an aggrieved competitor if there can fairly be attributed to Congress, expressly or impliedly, a purpose of protecting competitive interests like those of complainants.

■ In the light of these doctrines and criteria we conclude that American sailors have standing to complain that the executive officials have illegally and arbitrarily disregarded the statutory mandate to use American ships on military cargo. That conclusion is supported by the nature of the substantive statutory provisions and issues involved, and the protections contemplated by Congress.

We turn now to the statutes that we consider reflect sufficient concern for American crews and protection against

---

7. Professor Jaffe concludes that all that is required is that "an interest intended by the statute to be protected has been denied that protection." *See* Jaffe, Standing to Secure Judicial Review : Private Actions, 75 Harv.L.Rev. 255, 263, 266 (1961).

 In *Hardin* the Court also noted that protection of private utilities from TVA competition was "one of the primary purposes" of an area limitation provision, *see* 390 U.S. at 6, 88 S.Ct. 651.

8. *E. g.*, Pennsylvania R. R. C. v. Dillon, 118 U.S.App.D.C. 257, 335 F.2d 292, cert. denied *sub nom.* American-Hawaiian S.S. Co. v. Dillon, 379 U.S. 945, 85 S.Ct. 437, 13 L.Ed.2d 543 (1964).

9. National Assoc. of Securities Dealers v. SEC, 136 U.S.App.D.C. ——, 420 F.2d 83 (July 1, 1969) ; Wingate Corp. v. Industrial National Bank, 408 F.2d 1147 (1st Cir. 1969) (standing of data processors) ; Saxon v. Georgia Assn. of Ins. Agents, 399 F.2d 1010 (5th Cir. 1968) (insurance agents). A decision contrary to *Wingate* was rendered in Assn. of Data Processing Services Organizations, Inc. v. Camp, 406 F.2d 837 (8th Cir. 1969), cert. granted, 395 U.S. 976, 89 S.Ct. 2128, 23 L.Ed.2d 764 (June 23, 1969). In Arnold Tours, Inc. v. Camp, 408 F.2d 1147 (1st Cir. 1969), decided jointly with *Wingate*, standing was denied as to the travel agents.

foreign competition to avoid dismissal of their action for lack of standing. The legislative history of the 1904 Cargo Preference Act reveals a purpose to use preference on Government freightage in order to promote vitality and emergency availability of American ships and crews and to offset the disadvantage incurred in meeting foreign competition.[10] Crews on American ships were not confined in 1904 to American seamen as a matter of law, but that did not negative the prospect that American seamen would benefit from the law. In any event, the Merchant Marine Act of 1936 did contain a legal requirement assuring use of American crews.[11] Both the Cargo Preference Law and the Merchant Marine Act are interrelated parts of a wide-ranging statutory scheme to foster American shipping. It is appropriate to refer to both of them in considering whether Congress intended that seamen aggrieved by illegal official action be left without legal protection. The protection intended for American crews was certainly not diminished, if anything it was strengthened, by the reenactment of the cargo preference legislation in 1956.

Our determination does not signify that the issues tendered are necessarily appropriate for judicial scrutiny. Indeed, as will appear in Part III of this opinion, we conclude that certain questions raised by appellants relate to matters that have been committed by Congress to the discretion of the officials involved without being subject to judicial reexamination. But our conclusion on standing does serve to avoid dismissal of the action because of the nature of the parties and to bring us to the merits of the case.

## II. THE MERITS ON ISSUES NOT INVOLVING THE RESERVE FLEET

 On the merits we reinstate for the court en banc, and attach in the Appendix to this opinion, Parts II A, B, C, and D of the opinion written by Judge Wright for the panel, an opinion which was issued on December 27, 1968. In brief summary we hold in these rulings:

A. The Cargo Preference Act, which prohibits the use of foreign vessels to transport American military cargo, is subject to an implied exception that for-

10. *See* H.R.Rep. No. 1893, 58th Cong., 2d Sess. (1904) at 5:

It is never safe or wise to depend on foreigners for the defense of our own country. Our dependence must always be on our own men and ships to uphold the honor and dignity of our flag in the time of extremity.

This can not be unless such men and ships are at hand, ready and accustomed to service on the sea.

\* \* \* \* \*

To offset the disadvantage of our ships in competing with those of foreign nations the United States Government can afford at least the assistance of employing its own vessels and its own citizens for its own freightage.

This would insure part cargoes at least to keep the ships moving across the ocean. The employment of American ships instead of foreign ships would greatly aid our vessels now out of employment, continue officers, engineers and seamen on the ocean instead of employing an equal number of foreigners, and bring the construction and repairs to our own shipyards and me-

chanics, instead of developing the sea strength and industries of our national rivals and possible national enemies.

11. The statute provides, see 46 U.S.C. § 1132(a) (1964):

All licensed officers of vessels documented under the laws of the United States, as now required by law, shall be citizens of the United States, native-born or completely naturalized; and upon each departure from the United States of a cargo vessel in respect of which a construction or operating subsidy has been granted all of the crew (crew including all employees of the ship) shall be citizens of the United States, native-born or completely naturalized.

While this law did not require American crews on American flag ships as such, it had substantially that effect given the context of the use of subsidies as the key inducement to build ships in the United States and operate them under the American flag, and the context of cargoes leaving the United States accounting for the bulk of traffic involved.

eign ships may be used when American ships are not available.

B. This implied exception does not require a finding by the President himself rather than by other officials in the Executive Department.

C. The record shows no genuine factual dispute relating to appellant's contention that MSTS has in fact shipped military cargo in foreign ships when operating American vessels were available for use.

D. The finding that American flag ships are not available is not to be negatived by treating ships subject to requisition by the United States under 46 U.S.C. § 1242(a) (1964) as "available" within the meaning of the exception to the Cargo Preference Act.

### III. STATUS OF RESERVE FLEET VESSELS

Appellant argues that the Government-owned transport ships within the national defense reserve fleet are "available American ships," which must be used for military cargo pursuant to the Cargo Preference Act, before resort is had to foreign vessels.

The reserve fleet legislation, enacted as part of the Merchant Ship Sales Act of 1946, now provides, 50 U.S.C. App. § 1744(a) (1964): " * * * Unless otherwise provided for by law, all vessels placed in [national defense] reserve shall be preserved and maintained by the [Secretary of Commerce] for the purpose of national defense. A vessel placed in such reserve shall in no case be used for any purpose whatsoever except that any such vessel may be used for account of any agency or department of the United States during any period in which vessels may be requisitioned under [46 U.S.C. 1242] * * *." We have been in such a period since December 16, 1950, the date of President Truman's proclamation of national emergency.

The case involves the interplay of two statutes—the cargo preference legislation and the reserve fleet legislation. It is axiomatic that they should be construed so as to harmonize, and to the maximum extent effectuate, respective underlying policies. For this court to require laid-up ships to be reactivated in order to satisfy cargo preference provisions would negate the Congressional purpose of maintaining a reserve fleet as an emergency stockpile, and would turn a flexible asset into a millstone for those who must coordinate transportation of today's military cargoes with long-range defense requirements.

In our view the cargo preference legislation does not contain a mandate that overrides the judgment of the executive department whether to draw on the mothball vessels maintained for use in emergencies.

There being no overriding mandate, either of another statute, or the Constitution, we hold that the legislation providing for a reserve fleet available for use in emergencies authorizes a span of executive actions—pertaining to the fleet's establishment, expansion, curtailment, maintenance and use—that are "committed to agency discretion" within the meaning of § 10(a) (2) of the Administrative Procedure Act,[12] and are not subject to judicial surveillance and correction for error in the exercise of discretion.

Our conclusion does not set aside the general rule that official administrative action is reviewable in courts when a person claims injury from an act taken by a government official in excess of his powers.

While that is sound doctrine, recognized by decisions [13] and approved by scholars,[14] it is not a universal precept but only a general widespread rule, a rule subject to exceptions. These excep-

---

12. 5 U.S.C. § 701 (1964).

13. *See* American Sch. of Magnetic Healing v. McAnnulty, 187 U.S. 94, 23 S.Ct. 33, 47 L.Ed. 90 (1902).

14. *See* 4 K. Davis, Administrative Law Treatise § 28.05, at 25 (1958); L. Jaffe, Judicial Control of Administrative Action 346 (1965).

tions do not violate, they rather define, the rule of reviewability.

That the matter before us for consideration lies in the special zones of the exceptions, rather than the ordinary area of judicial reviewability, is established by several cardinal aspects of the issues. The case involves decisions relating to the conduct of national defense; the President has a key role; the national interest contemplates and requires flexibility in management of defense resources; and the particular issues call for determinations that lie outside sound judicial domain in terms of aptitude, facilities, and responsibility.

The legislative history reenforces this view of the nature of the reserve fleet law and executive actions contemplated under the law.[15] The significance of the features mentioned above is highlighted by court decisions to which we turn.

In Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp., 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948), the Court held, without dissent, that Presidential determination on applications for authority to engage in overseas and foreign air transport are not subject to judicial review. *See* 333 U.S. at 108, 111, 68 S.Ct. at 434, 436:

> That aerial navigation routes and bases should be prudently correlated with facilities and plans for our own national defenses and raise new problems in conduct of foreign relations, is a fact of common knowledge. * * * The President, both as Commander-in-Chief and as the Nation's organ for foreign affairs, has available intelli-

gence services whose reports neither are nor ought to be published to the world. It would be intolerable that courts, without the relevant information, should review and perhaps nullify actions of the Executive taken on information properly held secret. Nor can courts sit *in camera* in order to be taken into executive confidences. But even if courts could require full disclosure, the very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative. They are delicate, complex, and involve large elements of prophecy. They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil. They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and which has long been held to belong in the domain of political power not subject to judicial intrusion or inquiry.

The President's action in determining whether a person deserves appointment to a military commission, or any other position of trust and honor, is likewise not subject to judicial scrutiny. Orloff v. Willoughby, 345 U.S. 83, 92, 73 S.Ct. 534, 97 L.Ed. 842 (1953). So also is a decision over assignment to military service. *Ibid.*

These Supreme Court rulings are not dispositive by themselves of the matter before us. But they point up the relevant considerations. Perhaps closer in terms of particular issues, though not

---

15. *See* S.Rept. No. 807 at 5 (79th Cong. 1st Sess., 1945):

The Bill establishes a reserve of merchant vessels and provides that the vessels placed in reserve may not be used for commercial operations except in an emergency which would authorize the requisition of vessels under the Merchant Marine Act, 1936. In this reserve are to be placed those vessels which are necessary for the national defense as determined after consultation both with the Secretary of War and the Secretary of the Navy. * * *

The Maritime Commission and the Navy Department have under active consideration the problem of determining the size and composition of the merchant vessel reserve fleet to properly meet possible strategic needs. It is believed that * * * it is unnecessary to make express reference to the authority of the President in the premises and that the provision for the fleet is sufficiently flexible to be made fully effective.

identical, are circuit court rulings. Our own court has noted, in dictum:

It is—and must—be true that the Executive should be accorded wide and normally unassailable discretion with respect to the conduct of the national defense and the prosecution of national objectives through military means. The power of the armed services to make their dispositions of men and *materiel*, and to take measures for the safeguarding of each does not admit of fragmentation. (Emphasis added.) [16]

In United States ex rel. Schonbrun v. Commanding Officer, 403 F.2d 371 (2d Cir. 1968), cert. denied 394 U.S. 929, 89 S.Ct. 1195, 22 L.Ed.2d 460 (March 24, 1969), the court, through Judge Friendly, held that it must decline to review the military's refusal to grant a hardship exemption to a ready reservist ordered to report for active duty. *See* pp. 374–375:

The very purpose of a "ready reserve" is that the reserve shall be ready. Under the regulations, delay or exemption from active duty in hardship cases is authorized but not required. The hardship must be "extreme," and while the regulations wisely give more specific content to this criterion, a good deal is necessarily left to the judgment of the commanding officer. In contrast to the yea or nay character of entitlement to the conscientious objection exemption, administration of the hardship exemption necessarily involves a balancing of the individual's claims against the nation's needs, and the balance may differ from time to time and from place to place in a manner beyond the competence of a court to decide. While no one could reasonably assert that the country would perish if Schonbrun did not serve with his company, delay in the call-up of a reservist, even during the period necessary for judicial consideraion of his claim to discretionary exemption, inevitably means either a gap in the unit or the call of another reservist who otherwise might not have been reached.

While every case must turn on its own issues,[17] we think this analysis of people "reserves" is a meaningful parallel for the issue of vessel "reserves" before us. Before turning to more detailed consideration of reserve fleet legislation involved in the case before us, we think it appropriate to identify certain strands of doctrine that are not involved in our decision. We expressly note that our decision does not involve personal rights and liberties,[18] does not involve constitu-

16. Overseas Media Corp. v. McNamara, 128 U.S.App.D.C. 48, 385 F.2d 308, 314 (1967). The court held that a justiciable claim was made out by a publisher who claimed that the military, acting without criteria, had barred his newspaper from sale at newsstands of post exchanges, while admitting others. *See also* Leighton v. Securities and Exchange Commission, 95 U.S.App.D.C. 217, 221 F.2d 91, cert. denied 350 U.S. 825, 76 S.Ct. 54, 100 L.Ed. 737 (1955) (SEC's refusal to assume jurisdiction over sale of American Express travelers checks is action committed by law to agency discretion and therefore removed from the APA's review provisions.)

17. *See* Heikkila v. Barber, 345 U.S. 229, 233, 73 S.Ct. 603, 605, 97 L.Ed. 972 (1953):

[E]ach statute in question must be examined individually; its purpose and legislative history as well as its text are to be considered in deciding whether the courts were intended to provide relief for those aggrieved by administrative action."

For a general discussion of nonreviewability, *see* 4 K. Davis, *supra* note 14, § 28.01–28.21, at 1–113; Saferstein, Nonreviewability: A Functional Analysis of "Committed to Agency Discretion," 82 Harv.L.Rev. 367 (1968). For a differing approach, *see* Berger, Administrative Arbitrariness: A Synthesis, 78 Yale L.J. 965 (1969).

18. *See* Estep v. United States, 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567 (1946). We cannot believe that Congress intended that criminal sanctions were to be applied to orders issued by local boards no matter how flagrantly they violated the rules and regulations which define their jurisdiction. We are deal-

tional claims, and does not involve a right expressly granted by statute that qualifies what would otherwise be non-reviewable discretion.[19]

Furthermore, our decision does not contradict the principle that even where an official action is of a type which generally involves the exercise of discretion the court has power to inquire into a claim of abuse of discretion, or use of procedurally unfair and unauthorized techniques, inflicting injury on private citizens.[20] The point of our decision is that there is a narrow band of matters that are wholly committed to official discretion, and that the inappropriateness or even mischief involved in appraising a claim of error or of abuse of discretion, and testing it in an evidentiary hearing, leads to the conclusion that there has been withdrawn from the judicial ambit any consideration of whether the official action is "arbitrary" or constitutes an abuse of discretion.

This case does not remotely involve, and there is no claim seeking, the kind of exception that may justify judicial review in certain instances even as to matters generally committed to the final judgment of an official. These exceptional instances relate to a case where there has been not merely a contention of error or abuse of discretion, but also facts adduced in support of a claim of the kind of bad faith, fraud, or conscious wrongdoing which in effect undercuts the assumption that the personnel involved have been genuinely acting as government officials.[21]

The soundness of our conclusion that the decisions whether, when, and how to add to or detract from the reserve fleet in time of emergency, are committed to official discretion is established by the fact that these decisions are inextricably intertwined with and permeated by assumptions and conclusions of national defense strategy.[22]

ing here with a *question of personal liberty.* (Emphasis added.) 327 U.S. at 121, 66 S.Ct. at 427.

It is important to note that even though the *Estep* decision permitted review of an order deemed "final" by the statute, it did so in a context that would not disrupt the operations of the statutory scheme. The courts still refuse to interfere with decisions by the military affecting registrants who have been inducted. *See* Orloff v. Willoughby, 345 U.S. 83, 92–95, 73 S.Ct. 534, 97 L.Ed. 842 (1953); Noyd v. McNamara, 378 F.2d 538 (10th Cir.), cert. denied 389 U.S. 1022, 88 S.Ct. 593, 19 L.Ed.2d 667 (1967); McAbee v. Martinez, 291 F.Supp. 77 (D.Md. 1968), where the court held nonreviewable the decision to send a soldier to Viet Nam over a protest that he had been inadequately trained for combat. *See also* Schonbrun v. Commandant, *supra*; *cf.* Carter v. United States, 132 U.S.App. D.C. 303, 407 F.2d 1238 (1968) ("clogging of the wheels of government").

19. Oestereich v. Selective Service System Local Board, 393 U.S. 233, 89 S.Ct. 414, 21 L.Ed.2d 402 (1968).

20. Overseas Media Corp. v. McNamara, 128 U.S.App.D.C. 48, 56–58, 385 F.2d 308, 316–318 (1967); Gonzalez v. Freeman, 118 U.S.App.D.C. 180, 334 F.2d 570 (1964).

21. *See* United States v. Wunderlich, 342 U.S. 98, 72 S.Ct. 154, 96 L.Ed. 113 (1951).

Similarly this case cannot remotely involve the kind of exception set forth in *e. g.*:

(a) 41 U.S.C. § 321 (1964), where Congress inserted judicial review for a "final" action that was "so grossly erroneous as necessarily to imply bad faith."

(b) Leedom v. Kyne, 358 U.S. 184, 188, 79 S.Ct. 180, 184, 3 L.Ed.2d 210 (1958), where the Court carved out an exception to the doctrine that certification orders of the National Labor Relations Board are not subject to judicial review for "an order of the Board made in excess of its delegated powers and contrary to a specific prohibition in the Act."

This kind of exception may also extend to, *e. g.*, conflict-of-interest situations. *See* United States v. Mississippi Valley Generating Co., 364 U.S. 520, 549, 559, 81 S.Ct. 294, 314, 5 L.Ed.2d 268 (1961). (Statute requiring "singleness of purpose" in government agents is "directed not only at dishonor, but also at conduct that tempts dishonor.")

22. This fact is underscored by the deposition testimony of Admiral Donaho, Commander of MSTS, who testified on deposition that any actual decision to break out vessels from the reserve fleet is made in

In time of stress and emergency our officials need freedom to act. Congress gave the Executive such freedom in relation to the reserve fleet. The statute empowering officials to call upon the reserve fleet during a declared national emergency does not mean that they are obligated to draw upon this resource in every declared emergency. Yet the position adopted by appellant points to this result.

Even the determination of how long it will take to put a laid-up vessel into service for carriage of military cargo is not a mere mechanical computation. At the very least there will be questions of judgment as to the level of efficiency and reliability that is to be sought when reserve vessels are reactivated for emergency use.

The administration of commercial cargo preference provisions [23] involves questions of "judgment requiring close analysis and nice choices." [24] The issues of judgment take on a heightened dimension when such issues as deliverability and range of tolerable delay relate to supplies necessary for the military effort.

The range of executive judgments involved are likely to involve estimates as to when, where, and how much cargo will have to be moved in the future—not only military but also foreign aid cargoes. The decisions also require a judgment of the feasibility of providing sustained employment for a reactivated vessel. [25]

This court cannot sit in judgment to review a determination which involves appraisals like those outlined. The manifest difficulties cannot be obviated by construing the statute as requiring only that the authorities "consider" the feasibility of employing the reserve fleet ships for transporting military cargoes. There is no satisfactory exit once the judiciary crosses the threshold and enters the domain of these matters. Unless our determinations are to be merely precatory, a decision that Military Sea Transportation Service or the Department of Defense must "consider" using mothballed ships necessarily invites future litigation concerning first the fact of such consideration *vel non*, and then whether the consideration has sufficient rationality to escape condemnation as an empty formality.

Even restricted review requires probing the surface and going beyond mere conclusory affidavits setting forth the department's reasons. Any other ap-

---

the Office of the Secretary of Defense. In earlier testimony concerning the strategic nature of decisions as to what ships should be used for military cargoes, he said:

> A contingency plan is to be carried out that I am not cognizant of, the Joint Chiefs may have something they cleared with the President or Secretary of Defense, and they know what my capability is, and they, in carrying out National Policy, will say there has to be an additional force lifted somewhere three months from now. So they project whether I think I have that shipping capability available in three months, and if I don't, I would presume that I will be told to get shipping from some other source, and the only other American source, other than active ships is the National Defense Reserve Fleet. JA. 136–37.

23. The commercial cargo preference provisions were codified in 1954. 68 Stat.

832, 46 U.S.C. 1241(b) (1964). The law requires use of privately owned U. S.-flag bottoms for 50 per cent of all shipments to foreign governments that are directly or indirectly sponsored by the American Government.

24. These are the words of Justice Douglas writing for the majority in Panama Canal Co. v. Grace Line, Inc., 356 U.S. 309, 317, 78 S.Ct. 752, 2 L.Ed.2d 788 (1958).

Determining the reasonable availability of U. S. Flag ships involves, as one commentator has noted, "a function of both price and time, since shipments frequently cannot wait until additional tonnage is broken out of the reserves or diverted from other use." S. Lawrence, United States Merchant Shipping Policies and Politics (Brookings, Washington, D. C., 1966) at 173. *See also,* Administration of the Cargo Preference Act, H.Rept. No. 80, 84th Cong., 1st Sess. (1955).

25. *See* S. Lawrence, *supra* note 24, at 88–89.

proach belies the notion that these matters before us are not in fact necessarily committed to agency discretion. Settled doctrine does not permit us to accept at face value administrative determinations without at least surveying a record.[26]

We do not deal with officials who are operating under discernible statutory standards, or a mandate to develop standards to assure even-handed justice. They are rather likely to be called on to make and revise judgments freely, perhaps to draw heavily on information from sources abroad or in the domain of the military in making global guesstimates. Not all operations of government are subject to judicial review, even though they may have a profound effect on our lives.[27]

To avoid misunderstanding we note that the decision whether and how to let vessels out of the reserve fleet may well be influenced by a desire to use these ships, and American crews, in carrying American military supplies, and the awareness that when taken out of the reserve fleet they have a certain guaranty of employment arising out of the cargo preference legislation.

But there is no legislative mandate that is judicially enforceable which requires use of the mothball fleet to be given due consideration as a condition of use of foreign flag vessels. When, as, and if, executive officials reactivate reserve vessels into operating condition, they become fully "available" for the purpose of cargo preference legislation. Until then, they are part of a stockpile held for emergencies but not now in operation, and they are outside the category of available vessels that a court may mandate the executive officials to consider before shipping military supplies in foreign bottoms.

Affirmed.

## APPENDIX

Excerpt from Judge Wright's opinion issued December 27, 1968, *sub nom.* Curran v. Clifford *et al.*

## II

Coming then to the merits on the appeal from summary judgment, we must determine whether "there is no genuine issue as to any material fact" and whether appellees are "entitled to a judgment as a matter of law." Rule 56(c), Fed. R.Civ.P.

A. At the outset, we reject appellant's contention that the 1956 Act absolutely prohibits the use of foreign vessels to transport American military cargo. Where American ships are unavailable, we cannot suppose Congress to have intended that military supplies, perhaps urgently needed, must sit upon the docks despite the availability of foreign vessels to carry them. It would be absurd to derive such a result from a statute designed to further the national security through the development of a healthy merchant marine.

Thus an implied exception must be read into the 1956 Act: when American ships are not available, foreign ships may be used. This has indeed been the consistent administrative interpretation of the Act for over 60 years, dating from an Attorney General's opinion issued in

---

26. *See* Saferstein, *supra* note 17, noting that a premise like that underlying the dissent "assume[s] that abuses of discretion leap from the pleadings and that all a court need do to remedy an abuse is to reverse summarily." The author also points out that limited review of matters that are in fact necessarily discretionary may subvert the policies of the administrative program:

Nor can it be assumed that the scope of review can be so limited that agencies will remain free to administer their programs creatively. Even the well-intentioned court may find it impossible to review agency actions without somewhat constricting valid agency discretion, given the vagaries of any standard of review, including review for abuse of discretion.

27. *Compare* the analysis of Davis, "Judicial Control of Administrative Action," A Review, 66 Colum.L.Rev. 635, 652 (1966).

1907 [9] to the policy guidelines used by the Defense Department today.[10] That interpretation is here approved.

B. Appellant urges that any implied exception to the literal command of the statute must be read, like the explicit statutory exception for "excessive or otherwise unreasonable" rates charged by American shippers, to require a presidential finding before it is invoked. This contention too must be rejected. Congress in 1904 doubtless feared that low-level administrators might evade the Act's command by manipulation of the vague standard of "excessive or otherwise unreasonable." In the absence of an administrative agency suited to the purpose, it interposed the President as the interpreter of this standard.

The determination of the availability of American shipping, unlike the determination of the "reasonableness" of American shippers' rates, does not leave too much leeway for evasion or abuse. Further, the determination is primarily technical and logistic, rather than political or legal, and hence of a type more likely to be entrusted to line officials.

Moreover, rates set by conference (in the case of scheduled liners) remain reasonably stable over time. Their reasonableness can thus suitably be assessed at the top Executive level without too much burden on the office of the President. On the other hand, the availability of American shipping for the transport of military cargo fluctuates from day to day. Particularly as the determination of such availability is primarily a simple matter of fact, we cannot suppose that Congress meant it to be entrusted to the President.

C. Appellant's third contention is that MSTS has shipped military cargo in foreign ships when operating American vessels were in fact available for use. If this were true, it would indeed raise serious questions under the 1956 Act. A genuine factual dispute about this contention would serve to defeat summary judgment. However, we find no such dispute.

Appellant's case on this point conjoins an attack upon the procedures used to solicit American shipping with allegations of two instances in which available American ships were ignored in favor of foreign flag vessels. There is no dispute of fact concerning the procedures. The MSTS sends out requests for proposals to a large pool of brokers, agents and owners of United States flag ships. If insufficient shipping to meet current military needs is offered, MSTS sends a further request for proposals from United States or foreign flag ships. MSTS pays the market rate current at the time of charter for American shipping, and when such shipping is not forthcoming, pays the lower market rate for foreign charters.

Appellant attacks this procedure as insufficiently diligent to satisfy the terms and policy of the 1956 Act. In appel-

---

9. The opinion states, in pertinent part:
 " * * * [I]n my opinion * * * when no American vessels can be procured, even by the payment of unreasonable and exorbitant charges, there is the same right to employ other means of transportation which is expressly granted when such vessels can be procured but only at an excessive cost to the Government."
 26 Ops.Atty.Gen. 415, 419 (1907).

10. Defense Department policy with regard to the use of foreign vessels was set out in an MSTS Instruction dated August 31, 1965:
 "3. *Policy.* Cargo moved under the cognizance of MSTS shall be carried in U. S. flag ships unless suitable U. S. flag ships are not available or will not meet deadline dates on priority cargo. When this condition exists, foreign flag shipping may be employed by MSTS to the extent necessary to meet urgent military requirements. An urgent military requirement is deemed to exist when the loading or delivery of cargo or the arrangements incident thereto cannot be deferred without risk to cargo or to the efficiency, maintenance, or morale of Department of Defense activities and personnel overseas, or when such deferment will adversely affect, to an unwarranted degree, the utilization of port facilities."

lant's view the procedure fails to reveal all the American shipping which is in fact available. Appellant argues that American owners of both American flag and foreign flag of convenience vessels withhold the former from the Government in order to allow charter of the latter, for which the costs are lower, and the profits perhaps higher.

In support of its claim that privately-owned American ships are left idle while foreign ships transport our military cargoes, appellant has introduced by affidavit two instances. In both of these instances, MSTS, receiving no timely offers of American shipping, chartered foreign ships to carry cargo to Vietnam. The crews of the two Greek ships involved both refused to proceed. In both instances, American ships then were used to carry the stranded cargo.

In our view, the undisputed facts of these two incidents do not lend support to the conclusory allegation in appellant's affidavit that foreign ships were used while "United States flag vessels were available at rates which were reasonable and not excessive." Appellant has shown only that after chartering of foreign vessels, and their failure to perform on the charter, American ships were found. Given the day-to-day fluctuations in the availability of shipping, this goes no way toward showing that American ships were idle when the MSTS request for proposals was circulated or when the charter was made.

Nor do the MSTS procedures by themselves give rise to any inference that available operating American vessels are left idle while foreign ships are employed. When hiring vessels in the ordinary course of business, the Government can do little more than make known to the shipping industry its needs and its willingness to pay the market price. Indeed, the Commander of MSTS held meetings with American shipowners, and exhorted them by telephone, in a further effort to elicit American shipping.

Apart from the exercise of its powers to requisition private ships and break out part of the Government reserve fleet —powers which we discuss below—it is difficult to see what more MSTS could have done to obtain American sea transport for its military cargo even if it had been shown that American ships lay idle and unoffered. Accordingly, we find no issue of material fact concerning the availability of operating American vessels, and hence the District Court was justified in granting summary judgment as to this issue.[11]

D. Appellant next argues that ships subject to requisition by the United States under 46 U.S.C. § 1242(a) (1964) are "available" within the meaning of the 1956 Act.[12] Such ships fall into two classes, which must be treated separately.

First are American-owned American flag ships. Appellant urges that such ships are idle and available while foreign ships transport American military cargo, and that the Government must override the shipowners' unwillingness to offer them on the market, and must requisition them so that American seamen may transport American cargo.

11. Our ruling on this point does not, of course, bar future suits under the 1956 Act involving the same parties and the same issue, if evidence can be brought forward indicating that suitable operating American vessels are being left idle while foreign ships carry American military cargo.

12. The statute provides, in pertinent part: "Whenever the President shall proclaim that the security of the national defense makes it advisable or during any national emergency declared by proclamation of the President, it shall be lawful for the Secretary of Commerce to requisition or purchase any vessel or other watercraft owned by citizens of the United States, or under construction within the United States, or for any period during such emergency, to requisition or charter the use of any such property. * * *"

46 U.S.C. § 1242(a) (1964). President Truman proclaimed a national emergency on December 16, 1950, 50 App.U.S.C.A. p. 6 (1951), and this proclamation is still in effect.

As we found in rejecting appellant's claim challenging the MSTS procedures for hiring vessels, he has made no factual showing that privately-owned American ships were idle when the Government hired foreign vessels. Yet the 1956 Act can be violated only when the Government uses foreign ships, thereby leaving American ships and the American seamen who would man them idle. In the absence of a showing of the availability of idle American operating vessels, the question of the Government's duty to requisition such vessels is not ripe for decision in this case.

The second class of ships which appellant would have appellees requisition includes American-owned ships flying foreign flags of convenience, and foreign flag ships which are subject to "effective American control."[13] These ships are indeed subject to American requisition. Such requisition, however, would not necessarily benefit appellant and the American seamen whom he represents. The statute allows the United States to requisition ships by purchase or by charter. Requisition by purchase would of course bring the ships under the American flag, and hence under the statute requiring the use of American crews.

However, where requisition is undertaken to overcome temporary shortages it is much more likely to be by charter. If it were by time charter (with the owner manning and victualling the vessel) the foreign flag might well be retained; hence no benefit would accrue to appellant. If it were by bareboat charter (with the chartering party manning and victualling) we have the opinion of the Maritime Administrator that either flag could be flown.[14]

To satisfy appellant's claim on this issue, we would have to require the Executive at least to consider seriously the requisition of foreign flag vessels before it chartered any such vessels on the market. Yet the decision to requisition, impinging as it does upon the sovereignty of another nation, is a political decision involving complex questions of foreign relations.

Further, to fulfill the American seaman preference policy through requisition, the Government would not only have to take foreign flag ships, but to take them under only *some* of the forms available. A very clear congressional mandate would be required before courts could order the Executive to contemplate such a series of discretionary and political actions.

Such a mandate is lacking here. The 1956 Act requires that American military cargo be transported in American ships. We have limited its command to "American ships, where available." The traditional criterion of the nationality of a ship is the flag it flies. By this criterion, both privately-owned American flag ships and the vessels of the reserve fleet are *American*. Foreign flag ships, whether owned by Americans or subject to "effective American control," are not.

Where clear congressional intent or even compelling reasons of policy indicate, we might "pierce the flag veil" and find such ships to be "American" for certain purposes. Here there is no such clear intent and no such compulsion of policy. Hence we hold that foreign flag ships subject to American requisition are not "American" ships for purposes of the 1956 Act.

MacKINNON, Circuit Judge (concurring in the result):

I concur in the affirmance of the summary judgment denying the injunction

---

13. This category includes foreign flag vessels formerly operated under the United States flag, where the approval of the transfer of nationality, 46 U.S.C. §§ 808, 835 (Supp. II 1965–66), was conditioned on agreement that under all subsequent ownership the vessel would be treated as subject to requisition under 46 U.S.C. § 1242(a); and foreign flag vessels which are provided Marine War Risk Insurance, 46 U.S.C. §§ 1281–1294 (1964), upon similar agreement.

14. Deposition of J. W. Gulick, October 10, 1966.

but with respect to the National Defense Reserve Fleet Act I do not agree with the majority opinion that Curran has standing to bring that portion of the action. The majority opinion finds with respect to the Reserve Fleet Act that Curran cannot obtain the injunction he seeks because the matter is committed to agency discretion.[1] To say that the matter is discretionary with the agency, in my opinion, is merely a recognition of the fact that the Reserve Fleet Act does not confer any legally protected right on Curran and the persons he sues for. I thus conclude that Curran does not possess the necessary standing to attack the administration of the Reserve Fleet Act.

J. SKELLY WRIGHT, Circuit Judge, with whom Chief Judge BAZELON and Circuit Judge SPOTTSWOOD W. ROBINSON join, dissenting in part and concurring in part:

## I. STANDING

The majority's careful tracing of recent developments in the law of standing, and its thorough analysis of the Merchant Marine Act of 1936 and the Cargo Preference Law indicate that American seamen have been granted a "legally protected interest" which affords them the standing required to bring this case before our court. However, it seems to me that this court has the power to grant standing to these plaintiffs even in the absence of a finding that Congress intended to create such a "legally protected interest."

As the majority points out, there can be no doubt that the National Maritime Union of America, representing the interests of its members, is aggrieved in fact by the allegedly unlawful action of the Secretary of Defense. For even though in 1904 United States ships were not required to be manned by United States seamen, as of 1936 to date they are.[1] But appellee argues that aggrievement in fact alone is an insufficient predicate for standing to sue.

Some have contended that at least since the passage of the Administrative Procedure Act, which in Section 10 gives a "right of review" to "[any] person suffering legal wrong * * * or adversely affected or aggrieved * * * within the meaning of [any] relevant statute," 5 U.S.C. § 702 (Supp. IV 1965–1968), aggrievement in fact is all that is required to confer standing to challenge administrative action. The legislative history of the A.P.A., though conflicting, tends to support this interpretation, particularly in the Senate and House Committee Reports, both of which state that "[t]his subsection [Section 10] confers a right of review upon any person adversely affected in fact by agency action or aggrieved within the meaning of any statute." Senate Doc.No.248, 79th Cong., 2d Sess., 212, 276 (1946). Professor Davis, who espouses this construction,[2] cites a number of recent Supreme Court decisions which, though they do not discuss the A.P.A. expressly, seem to find standing simply on the basis that the plaintiff has suffered a "palpable injury." Bantam Books, Inc. v. Sullivan,

---

1. 5 U.S.C.A. §§ 701(a) (2), 702.

1. The statute provides:

 "All licensed officers of vessels documented 'under the laws of the United States, as now required by law, shall be citizens of the United States, native-born or completely naturalized; and upon each departure from the United States of a cargo vessel in respect of which a construction or operating subsidy has been granted all of the crew (crew including all employees of the ship) shall be citizens of the United

States, native-born or completely naturalized."

46 U.S.C. § 1132(a) (1964).

2. ,3 K. C. Davis, Administrative Law Treatise § 22.02 (1958). Professor Davis apparently feels that even before passage of the Administrative Procedure Act aggrievement in fact was sufficient to confer standing under the common law, and that the Supreme Court was simply wrong in Tennessee Electric Power Co. v. T. V. A., 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543 (1937). Id. § 22.04.

372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963); Cramp v. Board of Public Instruction, 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961); City of Chicago v. Atchison, Topeka & Santa Fe R. Co., 357 U.S. 77, 78 S.Ct. 1063, 2 L.Ed.2d 1174 (1958).[3]

This court, however, in the major decision discussing the question, has apparently rejected the notion that aggrievement in fact is alone sufficient to confer standing under the A.P.A. or under the common law. Kansas City Power & Light Co. v. McKay, 96 U.S.App.D.C. 273, 225 F.2d 924, *cert. denied*, 350 U.S. 884, 76 S.Ct. 137, 100 L.Ed. 780 (1955). *See also* Pennsylvania Railroad Co. v. Dillon, 118 U.S.App.D.C. 257, 335 F.2d 292 (1964). In *Kansas City* we followed the Supreme Court's teaching in Tennessee Electric Power Co. v. T.V.A., 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543 (1939), a pre-A.P.A. decision, and held that Section 10(b), 5 U.S.C. § 703 (Supp. IV 1965–1968), did not effect fundamental changes in the essentially judicially made pre-A.P.A. law of standing. Unless, therefore, the plaintiff had a "legally enforceable right" or was granted a right to sue under a particular statute, he would not have standing. Aggrievement in fact, while perhaps a necessary condition of standing, was not, we have held, made a self-sufficient one by the A.P.A.

Nevertheless, in *Kansas City* we were careful to point out that "we would certainly be prepared to hold in an appropriate case that one who complains of administrative action may find remedy under the Act beyond the strict scope of judicial review recognized prior to its adoption * * *." Though this is not precisely what the majority meant in

*Kansas City,* that case points the way. We should opt for a test of standing, at least in cases challenging administrative action, that would leave it in the discretion of the court to grant or deny standing where the plaintiff can claim no infringement of a legal right, but has in fact suffered or is suffering a palpable, concrete injury. This aggrievement in fact is all that is required to constitute a case or controversy in the constitutional sense.[4] Thus where the court has subject matter jurisdiction in such situations, it can hear the case, but need not. On the other hand, where the plaintiff does claim infringement of a legal right or has been granted a statutory right of review, the plaintiff, assuming the threshold injury in fact, has the right to prosecute his case in court, and it is not within the discretion of the court to deny him standing.

This approach secures the court adequate control over its docket without unduly restricting the people's access to the courts. It provides a mechanism by which the court can weed out those cases which do not bring the issue sharply into focus, and it is sufficiently flexible to expand and contract as our ideas of who should be allowed to challenge different kinds of governmental action evolve and grow. *See* Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). In *Flast* the Supreme Court emphasized the discretionary character of the standing doctrine and indicated that aggrievement in fact was the sole threshold requirement. There the Court said:

"* * * The fundamental aspect of standing is that it focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated.

---

3. *See* 3 K. C. Davis, *supra* Note 2, §§ 22.04, 22.17 (1965 Pocket Part).

4. This is not to say that there must be an injury in fact in order that there be a case or controversy in the institutional sense. Congress can authorize suits by "private attorneys general" to vindicate the public interest even where the private party has not suffered any injury different from

that suffered by the public generally. *See* Flast v. Cohen, 392 U.S. 83, 116–133, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) (dissenting opinion of Mr. Justice Harlan); Jaffe, Standing to Secure Judicial Review: Public Actions, 74 Harv.L.Rev. 1265 (1961). Professor Jaffe would go further and permit "public actions" in some situations even in the absence of specific statutory authorization.

The 'gist of the question of standing' is whether the party seeking relief has 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.' Baker v. Carr, 369 U.S. 186, 204 [82 S.Ct. 691, 7 L.Ed. 2d 663] (1962). In other words, when standing is placed in issue in a case, the question is whether the person whose standing is challenged is a proper party to request an adjudication of a particular issue and not whether the issue itself is justiciable. * * * A proper party is demanded so that federal courts will not be asked to decide "ill-defined controversies over constitutional issues,' United Public Workers [of America] v. Mitchell, 330 U.S. 75, 90 [67 S.Ct. 556, 91 L.Ed. 754] (1947), or a case which is of 'a hypothetical or abstract character,' Aetna Life Insurance Co. [of Hartford, Conn.] v. Haworth, 300 U.S. 227, 240 [57 S.Ct. 461, 81 L.Ed. 617] (1937). So stated, the standing requirement is closely related to, although more general than, the rule that federal courts will not entertain friendly suits, Chicago & Grand Trunk R. Co. v. Wellman, [143 U.S. 339, 12 S.Ct. 400, 36 L.Ed. 176 (1892)], or those which are feigned or collusive in nature, United States v. Johnson, 319 U.S. 302 [63 S.Ct. 1075, 87 L.Ed. 1413] (1943); Lord v. Veazie, 8 How. 251 [12 L.Ed. 1067] (1850)."

392 U.S. at 99–100, 88 S.Ct. at 1952–1953. (Footnotes omitted.)

In *Flast* the Court granted standing to a taxpayer alleging that certain Government expenditures violated the First Amendment's Establishment Clause. In so doing, the Court laid down certain restrictions on such suits, and made clear that a taxpayer did not, by virtue of that status alone, always have standing to challenge any federal expenditure. But the Court's limitations on such suits were all directed at assuring "that the questions will be framed with the necessary specificity, that the issues will be contested with the necessary adverseness and that the litigation will be pursued with the necessary vigor to assure that the constitutional challenge will be made in a form traditionally thought to be capable of judicial resolution." [5] 392 U.S. at 106, 88 S.Ct. at 1955. Where, as here, there is a palpable injury in fact and the requisite adverseness is assured, the court should, in its discretion, be empowered to grant standing. Applying a test of this sort to the case at hand, I would conclude that the court can, and on the facts of this case should, confer standing as a matter of discretion.

A combination of several reasons should impel us to grant standing to the seamen's union now. First, given the current legislation requiring that United States bottoms be manned by United States crews, the seamen are suffering a palpable, concrete, definite and particular injury as a result of the Secretary's allegedly unlawful action. Second, they are perhaps the only party with sufficient interest to challenge the Defense Department's allegedly unlawful administrative practice and thereby to vindicate the public interest in an adequate war time merchant fleet. For American shipowners, who would superficially appear to have a strong economic interest in the use of American bottoms, also own ships sailing under foreign flags and manned by foreign, low-paid, non-union crews. These owners, therefore, may be

---

5. While the Court in *Flast*, and in its quotation from *Baker*, speaks of the illumination of *constitutional* issues, the question of standing, of course, is not limited to such issues. Whether the challenged governmental action is alleged to be unconstitutional or simply illegal is irrelevant to standing. In fact, if anything, standing should be conferred more readily where *ultra vires* rather than unconstitutionality is charged since actions charging only the former do not raise as serious separation of powers considerations.

perfectly satisfied if the Defense Department does not reactivate the reserve fleet or require "flags of convenience" ships under American control to fly their true colors, because to do so would require the use of higher-paid United States seamen when shipping American military supplies.

That the union is quite likely the only party who will challenge the Secretary's actions weighs heavily toward the grant of standing. This sort of consideration was highly relevant in the landmark decision of F. C. C. v. Sanders Bros. Radio Stations, 309 U.S. 470, 477, 60 S.Ct. 693, 698, 84 L.Ed. 869 (1940), where the Supreme Court indicated that one reason for permitting a radio station standing to challenge the Federal Communications Commission's grant of a license to a competitor was "that one likely to be financially injured by the issue of a license would be the only person having a sufficient interest to bring to the attention of the appellate court errors of law in the action of the Commission * *." We relied heavily on this notion in Office of Communication of United Church of Christ v. F. C. C., 123 U.S.App.D.C. 328, 359 F.2d 994 (1966), where we granted standing to a group of "listeners" to challenge the license renewal of a television station serving their area. See also Scripps Howard Radio v. F. C. C., 316 U.S. 4, 62 S.Ct. 875, 86 L.Ed. 1229 (1942); F. C. C. v. N. B. C. (KDA), 319 U.S. 239, 63 S.Ct. 1035, 87 L.Ed. 1374 (1943).

Though these cases all involved challenges by plaintiffs claiming standing under a statute granting a right of review to "persons aggrieved * * * or adversely affected" by agency action, the fact that the plaintiff before the court is likely to be the only one with sufficient interest to challenge the action is relevant also where there is no such statute. For one of the prime functions of the essentially judicially created law of standing is to assure that the plaintiff before the court is one whose interests are such that he is most likely to prosecute his cause vigorously and to bring the controverted issues clearly to the attention of the court. See Flast v. Cohen, supra. This is not to say that the "best" plaintiff is always to be granted standing. In some instances it may be that no one is sufficiently affected by the allegedly unlawful action to give him the right to maintain a lawsuit. Here, however, the seamen suffer a clear, concrete and severe injury of a sort which is not suffered by the population generally. They are doubtless on a footing with the best plaintiffs we will ever have before this court.

## II. RESERVE FLEET VESSELS

The majority today holds that the reserve fleet legislation authorizes "a span of [judicially unreviewable] executive actions * * * that are 'committed to agency discretion' within the meaning of § 10(a) (2) of the Administrative Procedure Act * * *." I respectfully dissent.

According to both the Administrative Procedure Act and the "common law of judicial review" on which it was founded, Executive action is subject to judicial review unless "committed to agency discretion by law."[6] In the frequent cases where statutes by their terms neither make reviewable nor shield from review Executive action, there exists a presumption of reviewability. American School of Magnetic Healing v. McAnnulty, 187 U.S. 94, 23 S.Ct. 33, 47 L.Ed. 90 (1902); 4 K. C. Davis, Administrative Law Treatise § 28.05 (1958); L. Jaffe, Judicial Control of Administrative Action 346 (1965).

---

6. 5 U.S.C. § 701 (Supp. IV 1965–1968). The reach of this statutory exception to the general rule of reviewability is not clear. There is respectable authority supporting the proposition that even those actions which are "committed to agency discretion by law" are reviewable by the courts whenever there has been an abuse of that discretion. See Berger, Administrative Arbitrariness: A Synthesis, 78 Yale L.J. 965 (1969).

This "presumption of reviewability" is often regarded as reversed for certain types of Executive actions. Actions relating to the conduct of foreign or military affairs have not normally been reviewed by the courts, absent exceptional circumstances. 4 K. C. Davis, *supra*, § 28.16; L. Jaffe, *supra*, 363–369. Thus we would not normally review the failure of the Executive to exercise emergency powers granted it for the purpose of meeting the military needs of the nation.

However, in this case we are not confronted only by a statute granting such permissive emergency powers. We have before us also the 1956 Act, which commands in terms on their face absolute that American military cargo be shipped in American vessels. With this statute, Congress has confined the otherwise wide discretion of the Executive to hire military transport; Congress has made the decision as to the shipment of American military cargo itself.

The majority has already read into the words of the 1956 Act an exception to its command. Foreign ships may transport American military cargo where American ships are not "available." I agree. But the majority goes on to hold that the Executive has absolute and unreviewable discretion to rule that American ships in the reserve fleet are not "available" within the terms of that exception.

I am not prepared to go so far. I would hold that the policy of the 1956 Act as we have construed it—that American seamen be favored in the shipment of American military cargo—must be taken into account in the exercise of the power to break out the reserve fleet.

The national defense reserve fleet was established by the Merchant Ship Sales Act of 1946, 50 App. U.S.C. §§ 1735–1746 (1964). That Act provided for the sale of part of the large surplus of Government-owned transports and cargo ships built during World War II, and the retention of such other part as deemed necessary for the national security in a reserve fleet. The reserve fleet could be used either when the President had specifically authorized requisition of vessels, or when he had proclaimed a general national emergency.

One of the policies declared by the Ship Sales Act is that:

"It is necessary for the national security and development and maintenance of the domestic and the export and import foreign commerce of the United States that the United States have an efficient and adequate American-owned merchant marine * * * (4) composed of the best-equipped, safest, and most suitable types of vessels, constructed in the United States *and manned with a trained and efficient citizen personnel * * *.*"

50 App. U.S.C. § 1735(a). (Emphasis added.) This declaration of policy indicates to me that the Ship Sales Act, including its provisions concerning the reserve fleet, has in common with the 1956 Act and the Merchant Marine Act of 1936 the purpose of favoring American seamen.

Thus the purpose of the statute granting power to break out the reserve fleet is cognate with the "seamen benefit" purpose of the 1956 and 1936 Acts. The ships made available under that power must then be considered in principle as available under the 1956 Act, given the similar policies behind the two provisions.

In holding that the reserve fleet can be available as a matter of law for purposes of the 1956 Act, I would leave the Executive with wide discretion to determine the availability *in fact* of mothballed ships. Limited review, if indeed review of any kind is to be permitted, is inherent in matters touching national defense. Certainly what we might consider Executive "bad judgment," as distinguished from arbitrary action, is not a basis for review. A heavy burden must rest on anyone who would impugn the act of the Executive in the national defense area, particularly in time of national emergency.

Moreover, such a decision would imply no requirement that the entire reserve

fleet must be activated before a single foreign ship can carry American military cargo. It may be that large numbers of reserve vessels are for one reason or another unsuited to particular transport work. The slowness, cost or inconvenience of breaking out that fleet may be such as to render much of it in practical terms unavailable. I would leave such particular expert judgments to the Executive, subject to review only for abuse of discretion. Such a requirement would not require the Executive to undertake a possibly burdensome, detailed evaluation of the competing interests each time military goods were to be shipped. To avoid the need for making specific findings in particular cases, the Executive could decide to formulate and publish a general policy with respect to the accommodation between the use of the reserve fleet and the 1956 Act.

I would not permit the Executive to ignore the command of Congress that "[o]nly vessels of the United States or belonging to the United States may be used in the transportation by sea of supplies bought for the Army, Navy, Air Force, or Marine Corps." 10 U.S.C. § 2631 (1964). I would require that the Executive look to the reserve fleet, and have reason for passing over it, before it uses foreign ships to transport American military cargo.