KNOX HILL TENANT COUNCIL et al.,
Appellants,

v.

Walter E. WASHINGTON, Individually and as Commissioner of the District of Columbia, et al.

No. 22781.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 12, 1969.

Decided Feb. 4, 1971.

MacKinnon, Circuit Judge, concurred in part and dissented in part and filed opinion.

Mr. Richard B. Stewart, Washington, D. C., with whom Messrs. Peter Smith and J. Kirkwood White, Washington, D. C., were on the brief, for appellants.

Mr. John R. Hess, Asst. Corporation Counsel for the District of Columbia, with whom Messrs. Hubert B. Pair, Acting Corporation Counsel at the time the brief was filed, and Richard W. Barton, Asst. Corporation Counsel, were on the brief, for the District of Columbia appellees.

Mr. Frank B. Friedman, Atty., Department of Justice, with whom Messrs. George R. Hyde and Herbert Pittle, Attys., Department of Justice, were on the brief, for the federal appellees.

Before McGOWAN, LEVENTHAL and MacKINNON, Circuit Judges.

McGOWAN, Circuit Judge:

This appeal is from a judgment of the District Court denying a motion for a preliminary injunction and dismissing the complaint on the grounds of (1) failure to state a claim for which relief may be granted and (2) the action is an unconsented suit against the United States. Appellants are individual tenants (and associations of such tenants) of public housing facilities in the District of Columbia, suing on behalf of themselves and all others similarly situated (Fed.R. Civ.P. Rule 23), and complaining of the failure of such facilities to be properly maintained and repaired. Appellees are

officials of (1) the Department of Housing and Urban Development of the United States (HUD), (2) the National Capital Housing Authority (NCHA), and (3) the District of Columbia Government concerned with enforcement of the D.C. Housing Regulations. . The complaint seeks declaratory and injunctive relief. We are presently concerned only with the questions of (1) the District Court's jurisdiction to entertain the action at all, and (2) whether the complaint states a claim upon which relief can be granted. For the reasons hereinafter appearing, we reverse the judgment of dismissal and remand the case for trial.

I

Deeming it essential to an understanding of the issues raised by this appeal, we address ourselves first to the scheme under which public housing is provided in the United States generally, and in the District of Columbia in particular. The keystone statute is the United States Housing Act of 1937, as amended, 42 U.S.C. § 1401 et seq., sponsored by Senator Wagner of New York, and strongly supported by Senator Taft of Ohio. It was a recognition by the Congress that the social evils inherent in substandard housing throughout the nation would yield only to a demonstration of federal interest and the provision of federal funds.[1] The substantive provisions of that Act are prefaced (§ 1401) by an explicit declaration that it is

"the policy of the United States to promote the general welfare of the Nation by employing its funds and credit, as provided in this chapter, to assist the several States and their political subdivisions to alleviate present and recurring unemployment and to remedy the unsafe and insanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of low income, in urban and rural nonfarm areas, that are injurious to the health, safety, and morals of the citizens of the Nation * * *."

The Act went on (§ 1402(1)) to define the "low-rent housing," which it was its purpose to provide, as "decent, safe, and sanitary dwellings within the financial reach of families of low income;" and it characterized the latter (§ 1402 (2)) as persons unable to procure in the private market "an adequate supply of decent, safe, and sanitary dwellings for their use." The Act authorized loans and grants of federal money for both the construction and the operation of such housing, to the end not only that its low-income nature should be preserved, but also its "decent, safe, and sanitary" character.

The making and administration of such loans and grants are vested in HUD. They are available to locally created housing agencies throughout the country under continuing contracts in which those agencies assume certain obligations (42 U.S.C. § 1415(4)). One of those obligations is operation calculated

1. Senator Wagner's statement at the time the bill was introduced identified the relationship between adequate housing and the general welfare in these terms (81 Cong.Rec. 1521 (1937)):

"There exists in urban and rural communities throughout the United States, slums, blighted areas, or unsafe, unsanitary, or overcrowded dwellings, or a combination of these conditions accompanied and aggravated by an acute shortage of decent, safe, and sanitary dwellings within the financial reach of families of low income.

"These conditions are inimical to the general welfare of the Nation by (a) encouraging the spread of disease and lowering the level of health, morale, and vitality of large portions of the American people; (b) increasing the hazards of fire, accidents, and natural calamities; (c) subjecting the moral standards of the young to bad influences; (d) increasing the violations of the criminal laws of the United States and of the several States; (e) impairing industrial and agricultural efficiency; (f) lowering the standards of living of large portions of the American people; (g) necessitating a vast and extraordinary expenditure of public funds, Federal, State and local, for crime prevention, punishment and correction, fire protection, public health service, and relief."

to maintain the "decent, safe, and sanitary" character of the dwellings. It is the responsibility of HUD to police the performance of these contracts; and the sanctions with which it is armed in this regard are those of (a) reducing or terminating the annual federal contributions (42 U.S.C. § 1415(3)), (b) increasing the interest rate on loans or declaring them in default (42 U.S.C. § 1415 (1)), or (c) assuming the actual management of a project. It is further authorized to make emergency financial grants "where necessary to eliminate a serious hazard to life, health, or safety of the occupants * * *."

Outside the District of Columbia, local housing agencies characteristically come into being under authority deriving ultimately from the state legislatures. Within the District, and in order to enable its residents to share in the purposes of the Housing Act of 1937, the Congress acted to create a qualified local housing agency. The resulting statute is contained in the District of Columbia Alley Dwelling Law, 5 D.C.Code § 103 et seq. It designates NCHA as "a public housing agency within the meaning of, and to carry out the purposes of," the Housing Act of 1937. As such, it is authorized to receive grants or loans from HUD for the "construction, maintenance, or operation" of public housing projects, to enter into contracts incident to such receipt, and to comply with conditions contained in such contracts.

There is presently in being an agreement between NCHA and HUD entitled the "Consolidated Annual Contributions Contract." That contract provides that NCHA shall at all times (1) "operate each Project * * * solely for the purpose of providing decent, safe, and sanitary dwellings * * *" and (2) "maintain each Project in good repair, order, and condition." These undertak-

ings appear to be common to every such contract between HUD and a local housing agency. What is different between the District of Columbia and elsewhere is that, in the former, legal title to the physical facilities constituting a project is in the United States.

## II

The complaint in the District Court alleged that, despite repeated efforts by tenants to call attention to, and to secure correction of, defects creating hazards to health and safety, appellees have failed to respond in compliance with their various statutory, regulatory, or contractual responsibilities, including what are asserted to be implied covenants in the formal leases entered into between each tenant and NCHA.[2] It is alleged that inspectors of the D.C. Department of Licenses and Inspections have visited the premises and have served notices on NCHA of violations and deficiencies in respect of the D.C. Housing Regulations. Such notices have allegedly been ignored by the recipient, and not further pursued by the D.C. officials ultimately responsible for their enforcement. This last is said to be in contrast with enforcement actions taken against private landlords, and thereby to constitute a denial to appellants by the District officials involved of the constitutional right to equal protection guaranteed by the Fifth Amendment. The other appellees are variously charged with violating the Housing Act of 1937, the D.C. Alley Dwelling Law, the D.C. Housing Regulations, the annual contributions contract, and the individual leases.

The declaratory relief prayed for was that appellees be adjudged (1) under a duty to repair and maintain the premises in a decent, safe, and sanitary condition "as required by the United States Housing Act, the District of Columbia

---

2. The alleged defects relate to such things as broken windows and doors, missing screens, malfunctioning appliances, clogged toilets and tubs, roaches and vermin, inadequate heating, water seepage, and holes and cracks in ceilings and walls. Numerous affidavits from individual tenants in support of these allegations were filed with the motion for a preliminary injunction.

Alley Dwelling Law, and the Lease agreement, in compliance with the Housing Regulations of the District of Columbia," and (2) to have failed to discharge this duty. Injunctive relief to the same end was requested against all appellees; and, in addition, the D.C. officials were sought to be enjoined from failing or refusing to enforce the Housing Regulations against NCHA.

Appellants filed a motion for a preliminary injunction, accompanied by affidavits of individual tenants describing substandard conditions. The federal officials and the District officials countered with separate motions to dismiss.[3] Affidavits were submitted at this juncture by officials of NCHA. Upon these papers and the arguments of counsel, the District Court concluded that it was "without jurisdiction to maintain this action" and dismissed the complaint. It wrote no opinion but entered findings of fact and conclusions of law in the form proposed by appellees.

These findings of fact are in large part a recital of what the NCHA affidavits are said by the court to "establish." These are enumerated by the court as follows:

a. That NCHA has pending before the Department of Housing and Urban Development an application for $2,722,000 for the modernization of the Frederick Douglass Housing Project;

b. That in the absence of approval of the application so pending, NCHA has no funds available to permit maintenance of NCHA properties beyond the maintenance which is now being carried on throughout the properties operated by NCHA;

c. NCHA has not failed or refused to provide adequate screens on windows and doors of its housing properties but that to the contrary, NCHA has made significant expenditures of money in providing screens on windows and doors with respect to three of the four properties named in the complaint and with respect to the fourth, Knox Hill, a determination to rehabilitate a portion of Knox Hill was made some time ago, and NCHA has been installing jalousies in lieu of screen doors in the exterior doors of that project.

d. Adequate weather stripping has been installed on doors of all units within the housing projects but window insulation has not been provided for the reason that adequate infiltration of air in the dwelling units requires the windows to remain as originally installed.

e. NCHA has constantly maintained a trained crew of its own who together with employees of contract exterminators have regularly and adequately maintained an extermination program for vermin.

\* \* \*[4]

h. An official determination has been made by NCHA to terminate the use of the dwellings in Knox Hill and residents in occupancy have been and are being located in other low-rent housing projects operated by NCHA.

---

3. One was on behalf of all defendants except Dugas and Jacobs, who are identified more particularly in Note 5 *infra*. The other was styled as on behalf of Dugas and Jacobs, and also Washington and Fletcher "insofar as they are named as the superiors" of Dugas and Jacobs. Only the first such motion rested on sovereign immunity. Both claimed a failure to state a claim upon which relief could be granted.

4. The omitted items are responsive to a claim in the complaint that tenants have been overcharged for utilities. They recite that NCHA has discontinued the charges complained of, retroactive to April 1, 1968. It is appellants' position that this corrective action has not rendered their complaint moot in this particular, inasmuch as tenants remain liable for the overcharges imposed prior to April 1, 1968. The question of possible mootness is one appropriate for exploration upon remand.

The remaining findings are that (1) legal title to public housing projects operated by NCHA is in the United States, (2) tenants, including the individual appellants, entered into a lease executed on behalf of the United States by NCHA, and (3) the association appellants have no proprietary or leasehold interest in any of the premises.

The conclusions of law, apart from the ultimate one of an absence of jurisdiction, are that the NCHA affidavits negate any threat of immediate injury and disentitle appellants "to any injunctive or other relief against any of the defendants," and that appellants "have failed to state a claim against any of the defendants for which relief may be granted." NCHA is declared to be "an agency of the United States Government," and appellees Washington and Fletcher, insofar as they function as NCHA, perform only a federal function. Other named appellees are declared to be, respectively, officers and employees of NCHA and HUD. The penultimate conclusion is that the suit against officers and employees of HUD and of NCHA is an unconsented suit against the United States.

On appeal to this court, separate briefs were filed by the D.C. Corporation Counsel for what he termed the District of Columbia appellees;[5] and by the Department of Justice for what were described as the federal appellees, including Washington and Fletcher in their capacity as officials of NCHA. The only point argued in the first such brief is the asserted lack of authority of the District of Columbia to institute criminal proceedings against federal agencies and officers administering federal properties not in compliance with the D.C. Housing Regulations. It is said that, although the D.C. appellees do not consider that Congress can be understood as having subjected NCHA to the D.C. Housing Regulations, they instructed their inspectors to examine the public housing projects and to report their findings to NCHA. "It was hoped," says the brief, "that such a report would prompt the appropriate agencies and officials to take any necessary remedial measures," but it was not thought that their failure to do so could result in the invocation of criminal punishment—the only sanction authorized for infractions of the Housing Regulations.

The brief of the Department of Justice urges the correctness of the District Court's conclusion that it was without jurisdiction to proceed in the case. It takes its stand on sovereign immunity, asserting that the federal ownership of the physical properties making up the housing projects insulates those who control or administer them from suit, absent the consent of the United States. It characterizes the action as affecting the management of federal property, and denies both the power of the judiciary to entertain such a case and the applicability, direct or indirect, of the D.C. Housing Regulations to the property involved.

### III

In assessing the correctness of the District Court's dismissal of the complaint, it is essential to differentiate between its assertion of a total want of

---

5. The brief does not specify precisely who the District of Columbia appellees are considered to be, but it presumably covers Walter E. Washington and Thomas Fletcher, who are sued individually and as Commissioner of the District of Columbia, and Assistant to the Commissioner of the District of Columbia, respectively, as well as Dugas and Jacobs, who are sued individually and as officers of the District of Columbia Department of Licenses and Inspections. Washington and Fletcher are members of NCHA, but they also appear to have ultimate responsibilities with respect to the administration of the Department of Licenses and Inspections. Although appellee Washington continues on occasion to be referred to as "Commissioner" in legal documents like the pleadings in this record, since the reorganization of the structure of the D. C. Government by Presidential order, he is currently referred most often as "Mayor" of Washington City or by the transitional term of "Mayor-Commissioner."

jurisdiction, on the one hand, and, on the other, its characterization of the complaint as failing to state a claim warranting any relief. The former purports to be grounded in the concept of sovereign immunity, and presumably is confined to the NCHA and HUD appellees.[6] We direct our attention in the first instance to that matter.

The doctrine itself is in a considerable state of disrepair, at least in terms of intellectual respectability; and it is hardly in the original condition of pristine purity which once made it such a useful tool for Government lawyers seeking to dispense with trials on the merits. *See* 3 Davis, Administrative Law Treatise § 27.01 (Supp.1965); Jaffe, Judicial Control of Administrative Action 229 (1965); and Hart and Wechsler, The Federal Courts and the Federal System 1151 (1953). For inferior federal courts, however, it is not without some measure of continuing vitality until either the Supreme Court or the Congress administers the *coup de grace*.[7] Our function is to determine whether the District Court has in this case stayed within the visibly narrowed circle of the doctrine's current reach.

The cornerstone of the Government's submission to us on this score is the trial court's finding that the public housing projects in question are the legal property of the United States—a fact which is not in dispute. It is argued that, absent the consent of the United States, no suit will lie, under the existing formulations of the Supreme Court, which adversely affects the Government's title to such property, or which puts its federal administrators under judicial compulsion with respect to its management. The Government takes its text in this connection from the Supreme Court's statement in Larson v. Domestic & Foreign Corp., 337 U.S. 692 fn. 11, 69 S.Ct. 1457, 1462, 93 L.Ed.2d 1628 (1949), that

"  *  *  *  a suit may fail, as one against the sovereign, even if it is claimed that the officer being sued has acted unconstitutionally or beyond his statutory powers, if the relief requested cannot be granted by merely ordering the cessation of the conduct complained of but will require affirmative action by the sovereign or the disposition of unquestionably sovereign property  *  *  *."

As the Government variously puts the issue in its brief, "[t]his case is simply an effort to dictate how property of the United States should be operated," and "[i]t is firmly established that the courts

6. The District Court's conclusions of law are characterized by some obscurity in differentiating the various categories of defendants. The court nowhere refers in those conclusions to appellees Dugas and Jacobs although it states that Washington and Fletcher, insofar as they act as NCHA, "carry out a federal function and do not act as officials of the District of Columbia Government." It says that it is the suit against the officials of HUD and NCHA which is a suit against the United States, but it does not expressly except Dugas and Jacobs from its further conclusion of a want of jurisdiction for this reason. *See* Notes 3 and 5, *supra*.

As appears hereinafter, the court's earlier conclusion, namely, that the complaint does not state a claim for which relief may be granted, again is all-embracing in its reference to the defendants, although the facts derived from the affidavits upon which this conclusion appears to rest are relevant in no way to Dugas and Jacobs, except as they be taken to establish, contrary to the allegations in appellants' affidavits and to the representations in the D. C. Government's own brief, that the housing projects were maintained in full compliance with the Housing Regulations.

7. The Administrative Conference of the United States, despairing of relief at the hand of a Supreme Court which has combined verbal denigration of the doctrine with continued implementation of it, has turned to the Congress. *See* Cramton, Nonstatutory Review of Federal Administrative Action: The Need for Statutory Reform of Sovereign Immunity, Subject Matter Jurisdiction, and Parties Defendant, 68 Mich.L.Rev. 389 (1970). The statutory proposals to this end emanating from the Conference are currently embodied in S. 3568, 91st Cong., 2d Sess., which was the subject of hearings on June 3, 1970, by the Subcommittee on Administrative Practice and Procedure of the Senate Judiciary Committee.

will not interfere with the public administration of government property." The precedent regarded by the Government as clearly demonstrative of the barrier to jurisdiction raised by sovereign immunity here is Gardner v. Harris, 391 F.2d 885 (5th Cir. 1968), a case which has its closest counterpart in Supreme Court authority in Malone v. Bowdoin, 369 U.S. 643, 82 S.Ct. 980, 8 L.Ed.2d 168 (1962). In the latter, an action of ejection against a Forest Service officer was said to be barred, even though the defendant was wrongfully occupying land belonging to the plaintiff, where there was no allegation that the defendant was acting outside his statutory authority or in contravention of the Constitution.

*Gardner* is at least a legitimate progeny of such reasoning. There the plaintiff claimed to be entitled to an access easement reserved in land sold to the United States by his predecessor in title for use as a parkway. When the federal officer in charge put up barricades to deny the access, plaintiff sued for their removal. It was held that, since a judgment on the claim would compel an act by the Government, and since it did not appear that any statutes forbade the putting up of the barricades, jurisdiction was barred even though the federal officer might be acting in wrongful derogation of plaintiff's access right. These cases have been strongly criticized, *see* Cramton, Note 7 *supra*, at 412–414, but, in any event, they hardly seem controlling of the matter before us. No more do cases like Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963), and Hawaii v. Gordon, 373 U.S. 57, 83 S.Ct. 1052, 10 L.Ed.2d 191 (1963), which round out the most recent pronouncements by the Supreme Court on sovereign immunity in cases involving federal lands.

Appellants insist, however, that they assert no claim adverse to the Government's title to the property involved herein, nor do they seek to compel a disposition or administration of that property contrary to that expressly commanded by the Congress itself. What they seek, rather, is a judgment that the officials entrusted with that property for a particular purpose should execute that trust in accordance with its terms, and desist from ignoring the obligations imposed upon them in that regard. In neither purpose nor effect will the prosecution of this suit disturb or diminish either the Government's title or its possession. The relief sought will rather, so it is said, return appellees to the path of their duty as marked out by the Congress.

To the extent that sovereign immunity survives as an assurance that courts, rather than the Congress, will not dictate the disposition or utilization of property which belongs to all the people and which, with good reason in democratic theory, has been immemorially thought to reside under the legislative will, we find no threshold jurisdictional bar in the record before us. There is nothing new about judicial entertainment of suits which charge that federal officials are acting outside of, or in conflict with, the responsibilities laid upon them by the Congress or the Constitution.[8] Whether such charges are true, and, if so, what remedial action the court should or may direct, are questions partaking of the merits, and not of jurisdiction to explore the merits.

If, after trial, it be found that appellees do in fact have a responsibility for the property in their care which they are not recognizing adequately, the court's power, at the least, to declare that responsibility and to define that de-

---

8. The way was first pointed in Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), a case involving a state officer. The theory there evolved has been applied intact to the errant federal officer. *See* Cramton, Note 7 *supra*.

Long before *Ex parte Young*, however, judicial authority was exercised through the writ of mandamus to compel public officials to adhere to the duties imposed upon them in their official capacities.

fault is not dissipated solely by the circumstance that legal title to the property is in the United States.[9] To hold otherwise would be to say that sovereign immunity forecloses any judicial inquiry whatsoever into the custodianship by a federal official of federal property. There is no magic about real estate, or its ownership by the United States, which hedges its guardians about with an immunity not available to other executants of public policies committed to their care by the Congress.[10]

Our review hereinabove of the statutory foundations for the provision of public housing in the District of Columbia reveals a recurring preoccupation on the part of Congress with the need that such housing be "decent, safe, and sanitary." To the degree that it is not, the legislative purposes are frustrated and fail of realization. A trial may reveal that, if such frustration exists, culpability does not lie with appellees. At this stage, however, as in any lawsuit, we deal in allegations, not proofs or remedies.[11] All we decide is that no viable concept of sovereign immunity known to us, nor as yet adumbrated by the Supreme Court, closes the courthouse doors completely to these appellants.[12]

## IV

The findings and conclusions of the District Court are such as to suggest that its dismissal of the complaint was principally, if not entirely, motivated by considerations of sovereign immunity. This indeed is the way the Department of Justice, in its brief for the federal officials in this court, has chosen to treat it; and the Department has not

---

9. It is not certain that legal title to all the premises affected by this litigation is in the United States. Authority is conferred upon NCHA by 5 D.C.Code § 113 to lease properties from private owners for use in public housing; and the United States Housing Act, 42 U.S.C. § 1421b, contemplates that federal money may be used for this purpose. It appears that NCHA is now operating a number of leased units of this provenance, and there have been strong recommendations for significantly enlarged use of this approach.

10. Appellants advert with some force to the anomaly that a housing project built and operated with the aid of federal funds by a non-D.C. local housing authority is not beyond judicial inquiry in a suit complaining of maladministration. Holmes v. New York City Housing Authority, 398 F.2d 262 (2d Cir. 1968). See also Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920 (2d Cir. 1968), Powelton Civic Homeowners Ass'n v. HUD, 284 F.Supp. 809 (E.D.Pa. 1968), and Western Addition Community Organization v. Weaver, 294 F.Supp. 433, (N.D.Cal.1968). It is also true that complaint may be made and pursued in both federal and state courts against state welfare officials for acts not in accordance with the federal standards prescribed for the administration of grants in aid. Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968).

11. In Norwalk, Note 10 supra, the Second Circuit turned aside a protest against judicial scrutiny of allegedly invalid redevelopment location procedures as intolerable interference by the judicial branch with the executive by saying (395 F.2d at p. 929) that "[w]ith this case only at the pleadings stage, we do not think we should speculate on what specific remedies might be appropriate if plaintiffs' allegations are proved."

12. Appellants have insisted that, at the least, there has been a waiver of sovereign immunity in the case of the HUD appellees. They recite that Congress originally vested administration of the federally-assisted public housing program in the United States Housing Authority, the functions of which have since been assumed by HUD. Congress has said in 42 U.S.C. § 1405(b) that the Authority "may sue and be sued in its own name." Appellees are silent on this point in this court, although in the District Court they pointed to § 1404a which provides that the Authority "may sue and be sued only in respect of its functions under this chapter, and sections 1501–1505 of this title." They argued that the Authority's functions included no duty of any kind owing to appellants. The District Court did not rule on the point, nor do we in the light of the disposition otherwise made by us of the sovereign immunity issue.

undertaken to defend the District Court's action by reference to the separately stated conclusion of law that the complaint fails to state a claim upon which relief may be granted.[13] The statement is in the record, however, and we think it desirable, if perhaps not essential, to deal with it as a possible independent ground for sustaining the judgment appealed from.

The physical arrangement of the District Court's legal conclusions strongly indicates that the one in question, which is the second in the series, is tied to the first. That first one recites that, on the basis of the NCHA affidavits, appellants "have failed to demonstrate any immediate threat of injury and therefore are not entitled to any injunctive *or other relief* against *any* of the defendants." (Emphasis supplied.) This obviously goes beyond a mere denial of the need for injunctive relief, either preliminary or permanent; and what it says is restated in more conventional pleading terms by the immediately succeeding paragraph, *i. e.,* that the "plaintiffs have failed to state a claim against any of the defendants for which relief may be granted." What this all amounts to in this context is a resolution against appellants of factual issues appearing from the papers to be in dispute, and the consequent grant of summary judgment to appellees on the merits. That is error.

The NCHA affidavits, as characterized by the District Court, do a number of things. First, they refer to pending efforts by NCHA to get more money from HUD for modernization of one of the D.C. housing projects; and they assert that, absent success in that regard, NCHA has no resources admitting of maintenance and repair in a greater degree than that presently being carried out. Second, they deny the allegations of appellants, in complaint and affidavit, that there is inadequate provision of screens and weather stripping for windows and doors, or for vermin extermination. Third, they report steps taken to terminate, retroactively to April 1, 1968, charges to tenants for excess utility charges, of which appellants had complained. Fourth, they recite a supervening determination to end the use of the Knox Hill project and to relocate its occupants in other public housing facilities.

With respect to the first of these matters found by the District Court to have been established by the NCHA affidavits, the lawsuit surely is not to be cut off in its inception by an affidavit that NCHA is financially unable to do more than it is now doing by way of maintenance. The extent of that incapacity, and the level of current maintenance, are themselves questions of fact better determined after trial than by unilateral and ambiguous assertion; and, in any event, the fact of incapacity, if proven, would appear to bear upon the nature of the relief available to appellants rather than upon their asserted right to adequate maintenance and repair.

Similarly, the affidavits of appellants and NCHA are in conflict as to the adequacy of the maintenance presently being provided, and these present factual issues not properly resolvable except through the adversary processes of trial. The seeming capitulation by NCHA on the matter of the utility charges is not complete, so we are told, in that tenants remain liable for the challenged charges, now conceded to have been improper, before April 1, 1968. Lastly, the closing down of Knox Hill does not render this lawsuit moot, inasmuch as the claims of injury made in the complaint are not limited to Knox Hill but comprehend other projects operated by NCHA.

13. The Department's brief states one main point, namely, that the "district court has not been vested with jurisdiction to require that property owned by the United States be maintained according to the standards of the District of Columbia Housing Code." The argument under that rubric is constituted of three propositions, two of which are expressly related to sovereign immunity. The third is that federally owned property is not subject to the D. C. Housing Regulations.

Thus it is that we do not find, in the circumstances seemingly relied upon by the District Court, a basis for sustaining a dismissal of the complaint for failure to state a claim. We turn now to the other contention, made upon appeal by both the D.C. Government and the Department of Justice, which might conceivably be thought to support such a disposition. That is the argument that the D.C. Housing Regulations have no force of any kind in creating or measuring the responsibilities of appellees. It is said that those Regulations simply do not apply to dwellings owned and operated by the United States, and the principal authority pressed upon us for this proposition is United States v. Wittek, 337 U.S. 346, 69 S.Ct. 1108, 93 L.Ed. 1406 (1949). That case presented the question of whether the District of Columbia Emergency Rent Act applied to Government-owned defense housing in the District. We are reminded that the Supreme Court, in reaching the result of non-applicability, stressed that the Rent Act did not refer expressly to the United States as a landlord, and reiterated a principle of statutory construction to the effect that "[a] general statute imposing restrictions does not impose them upon the Government itself without a clear expression or implication to that effect."

Rules for the reading of statutes are general guides only, and yield to the more tangible immediacies of the particular case. The Supreme Court has elsewhere said that "[t]here is no hard and fast rule of exclusion," and that the "purpose, the subject matter, the context, the legislative history and executive interpretation of the statute are aids to construction which may indicate an intent * * * to bring state or nation within the scope of the law." United States v. Cooper Corp., 312 U.S. 600, 604–605, 61 S.Ct. 742, 743–744, 85 L.Ed. 1071 (1940). It was in this spirit that the Court approached the problem of construction presented to it in *Wittek*. It noted that the central and pressing legislative purpose there was to prevent the exploitation by private landlords of the emergency demand for housing in Washington created by the outbreak of World War II. That purpose was sought to be achieved by limiting rentals to those in being on January 1, 1941. But public housing in the District had been under Government ownership and control long prior to that date, with subsidized low-income rentals unrelated to free market rates. The Court was unwilling, in the absence of an explicit manifestation to the contrary, to attribute to the Congress an intent to lump together, for purposes of protection against rent gouging, two such disparate quantities as private and public housing.

The Congress that authorized the D.C. Government to promulgate the Housing Regulations to assure D.C. residents suitable housing is, however, the same legislative body that, in the Housing Act of 1937 and the D.C. Alley Dwelling Law, acted to provide lower-income D.C. residents with "decent, safe, and sanitary" living accommodations. The concern for the condition of these premises voiced in these latter enactments hardly suggests that Congress consciously rejected the thought that the D.C. Housing Regulations, unlike similar local codes in other parts of the country, should bear no relationship whatsoever to the people living in Government-owned, as distinct from privately-owned, homes.[14]

Such a differentiation between citizens of this country similarly situated makes no sense at all in terms of the purposes

---

14. Reference has been made earlier to the fact that NCHA is authorized to, and does, lease privately-owned premises which it leases in turn to low-income tenants. Note 9 *supra*. HUD requires of local housing agencies that leased facilities of this kind "shall meet any applicable provision of local codes." HUD Low Rent Housing Circular, Oct. 10, 1965, p. 6. NCHA, presumably in deference to this requirement, publicly represents that privately-owned premises leased by it for this purpose "must comply with the D. C. Housing Code." NCHA Informational Bulletin, Program of Leasing Private Accommodations, August 19, 1968, p. 2.

of a Congress which has repeatedly voiced its concern for the social conditions which obtain in the Nation's Capital. Certainly those charged with the administration of the Housing Regulations have detected no such discrimination in the terms of their mandate. The D.C. Board of Appeals and Review has held that the Housing Regulations are directly applicable to public housing units, and that the elimination of a noncomplying condition is the obligation of the landlord. Appeal of Belk, Docket No. H 126, January 31, 1967. And, as we have seen, the D.C. appellees in charge of enforcement have thought it their duty to inspect NCHA premises like all others and to report violations, even though they felt the Housing Regulations to be inapplicable in the sense of providing no enforceable sanctions against their fellow appellees.[15]

The District Court, in any event, made no determination that the Housing Regulations are inapplicable or irrelevant to the projects operated by NCHA. Indeed, there is no reference of any kind to those Regulations in either its findings of fact or conclusions of law, which suggests that they played no part in its decision to dismiss the complaint. The complaint alleged, however, that appellees were variously violating and refusing to enforce the Regulations; and it is argued by appellants that the Regulations are either directly applicable or provide a standard by which to measure the alleged obligation to provide "decent, safe, and sanitary" dwellings. The record shows, moreover, that tenants of NCHA execute individual leases covering the premises occupied; and appellants allege that those leases, properly viewed, contain an implied warranty of habitability, the observance of which is to be gauged by the Housing Regulations in force from time to time.

Since this appeal came under submission, this court has found such a warranty to reside in all leases relating to premises covered by the Regulations. Javins v. First National Realty Corporation, 138 U.S.App.D.C. 369, 428 F.2d 1071 (1970). Building upon an earlier ruling of the D.C. Court of Appeals that the Housing Regulations operated to invalidate a lease of premises not in compliance when the lease was executed, Brown v. Southall Realty Corp., D.C.App., 237 A.2d 834 (1968), we were unable to distinguish the situation where violations develop because of improper maintenance during the life of the lease. We held that, "by signing the lease the landlord has undertaken a continuing obligation to the tenant to maintain the premises in accordance with all applicable law," which law included the Housing Regulations. Thus, we said, whether or not those Regulations are enforced directly by official action— and we remarked the widespread failures in this regard—the tenant will have available for his protection the defenses and claims normally associated with breach of contract.

It may or may not be true that the parallel between private leases and public housing leases is, for this purpose, exact. But the issue is at least a very substantial one in the light of *Southall* and *Javins*, and appellants are entitled to have it considered as part of their other conten-

---

15. Even though Congress be taken as not intending that the Housing Regulations be criminally enforced against the NCHA and HUD appellees, it does not follow that the Housing Regulations were thought to have no significance for the D. C. housing projects. There are indications that the broad standard of "decent, safe, and sanitary" laid down by Congress was envisaged as taking its content from local housing codes, and was, therefore, to be interpreted and applied in the light of them. Our decisions in Klein v. District of Columbia, 133 U.S. App.D.C. 129, 409 F.2d 164 (1969), and Curtis v. District of Columbia, 124 U.S. App.D.C. 241, 363 F.2d 973 (1966), are instructive on this score. In these cases this court upheld the admission of provisions of the D. C. Building Code as evidence to establish negligence under the Federal Tort Claims Act. Although not directly applicable to the building construction in question, the court regarded the Building Code as a relevant gloss upon the broad negligence standard of the Tort Claims Act.

tions. They allege in their complaint the existence of an implied warranty of habitability in their leases, and they base upon that allegation a request for both declaratory and injunctive relief. With that complaint reinstated by reason of our recognition of jurisdiction in the District Court, they are at liberty to pursue the matter at trial.

What we do not contemplate is that the issue of the D.C. Housing Regulations shall be made the occasion of a second resolution of this suit against appellants without trial. In their main brief in this court appellants, after making their jurisdictional arguments, recognized that this court "may not wish to consider * * * in the abstract context of an appeal from a dismissal on the pleadings" the merits issues of whether "the unsafe and unsanitary condition of the public housing projects violates applicable legal requirements." They noted by way of example that "the precise relevance of the various provisions relied upon by [appellants] may turn on how seriously substandard is the actual condition of [appellants'] housing, as disclosed by the proof at trial." Such considerations, it was said, "may counsel postponing consideration of some or all of [such] issues * * * until after trial." We think this to be an approach as rational as it is candid.

Appellants formulate these merits issues in several ways. First, they assert that, even if there were no Housing Regulations, the explicit Congressional purpose in the Housing Act, reiterated in the D.C. Alley Dwelling Law, to provide "decent, safe, and sanitary" housing creates a duty which has been violated. They deny that this statutory standard, standing alone, is too vague to admit of a judicial determination that it has been breached, at least in respect of such matters as inadequate screens, stopped-up plumbing, and similar defects which they have alleged.

Secondly, they point to the Annual Contributions Contract, p. 6 *supra*, under which HUD undertakes to provide continuing operating subsidies on condition that NCHA shall provide "decent, safe, and sanitary dwellings," and "maintain each Project in good repair, order, and condition." They assert that they will show NCHA to be in default in the observance of these conditions, and that they, as the intended beneficiaries of that contract, are thereby entitled to relief against both HUD and NCHA.

The Housing Regulations enter into this picture in either of two ways, according to appellants. Without the necessity of holding the Regulations directly and immediately applicable in the fullest sense, as they surely are to private housing in the District, they constitute at least a point of reference for giving content and meaning to the statutory standard of "decent, safe, and sanitary" reflected in the Housing Act and Alley Dwelling Law, and to the contractual standard embodied in the Annual Contributions Contract. Alternatively, they assert that, in this closely-woven matrix of Congressional concerns about housing in the District of Columbia, it is not farfetched to insist that Congress may fairly be taken to have intended that the Housing Regulations, which it authorized the District to promulgate, were conceived of as extending to public, as well as private, housing.

Lastly, there is the issue of whether, under either of the foregoing views of the relevance of the Housing Regulations, the individual lease agreements between the tenants and NCHA are to be taken as containing warranties of habitability by implication, as is true of private leases under *Southall* and *Javins*.

What we have said above indicates that we do not regard any of these approaches as insubstantial. Now that appellants' right to be in court has been established, we think that the orderly administration of justice is best served by leaving their definitive resolution to abide the illumination of trial and the consequent es-

tablishment of facts which should prove helpful in that resolution.[16]

## V

In reversing and remanding for trial, we hold only that the District Court erred in regarding itself as without jurisdiction by reason of sovereign immunity and, to the extent that its dismissal was founded upon separate factors subsumed under the formula of failure to state a claim, in nonsuiting appellants for that reason. As appellants themselves assert, the only issue before us on this appeal is the one of their right to stay in court for inquiry into, and resolution of, the claims put forward in their complaint. The merits of those claims abide trial.

■ There are suggestions before us that, even if appellants be right in at least some of their claims, there is nothing that can be done about them. This is notably true of the brief filed on behalf of the D.C. officials charged with enforcement of the Housing Regulations. They say in effect that they have enforced the Regulations against NCHA up to the point of invoking criminal sanctions—a step they feel powerless to take against federal officials. We are persuaded that, as to these appellees alone, the record before us shows a want of the equity which must underlie the grant of both injunctive and declaratory relief; and we see no real purpose to be served by compelling them to continue as parties to this proceeding. Their future

course of conduct will undoubtedly be shaped in good faith by reference to the final resolution of the issues presented by this litigation. *See* Palmer v. District of Columbia, 26 App.D.C. 31 (1905). We affirm, therefore, the dismissal of the complaint in respect of the D.C. appellees responsible for enforcement of the Housing Regulations.

In the same way, it is intimated that the officers of both NCHA and HUD are not happy about the physical condition of these housing units but are doing the best they can with the limited funds at their disposal. HUD further suggests that the sanctions available for its use against NCHA not only rest in a discretion so broad as to render their use or non-use immune from judicial compulsion, but are also of such a character as to be far from being uniformly in the interest of the tenants themselves. There may well prove to be some practical, and perhaps legal, significance in these suggestions. But their precise contours are poorly defined in the present state of the record, and they will profit by the clarifying processes of trial. More to the point, they would appear to be most clearly relevant to remedies as distinct from rights. It is one thing to declare a duty and another to compel its performance under the threat of contempt. Appellants have, throughout their presentation to this court, exhibited a realistic appreciation of this distinction, and of the large discretion reserved to the trial court to withhold or to shape the relief

16. Judge MacKinnon, dissenting on this point, views the complaint as failing to state a claim upon which relief could be granted because Congress has determined that the maintenance and repair policies of NCHA are nonreviewable. His concerns—lack of manageable standards for decision, inability of courts to oversee day-to-day agency activities, and considerations of increasing workloads—are matters only marginally related to jurisdiction. They are, rather, comprehended within the judicial discretion to grant or to withhold injunctive relief.

Although the Congress presumably may on occasion create rights without providing a judicial remedy, the Supreme Court has declared the normal presumption to be to the contrary, namely, persons aggrieved by agency actions are not to be denied a judicial forum in the absence of a persuasive showing of a conscious Congressional design to do so. Abbott Laboratories v. Gardner, 387 U.S. 136, 140–141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). We are unable to find in the Congressional proceedings adequate rebuttal of this presumption. *See also* the expansive review provisions of the Administrative Procedure Act, 5 U.S.C. § 702 (Supp. V, 1970) ("A person suffering legal wrong because of agency action * * * is entitled to judicial review thereof.")

given in the light of the practicalities emerging from the record.

We think it premature, however, to affirm the dismissal of any of these two groups of appellees from the case at this time because of the possibility that some, or any, relief may prove to be unwarranted or inappropriate.[17] With jurisdiction established in the District Court, those are matters to be determined by it in the first instance.

The judgment of dismissal of the complaint is reversed, except as to the D.C. appellees responsible for the enforcement of the Housing Regulations; and the case is remanded for further proceedings consistent herewith.

It is so ordered.

MacKINNON, Circuit Judge (concurring in part and dissenting in part):

The opinion for the court concludes (1) that the doctrine of sovereign immunity does not stand as a bar to the exercise of jurisdiction in this case, and (2) that the complaint states a claim for which judicial relief may be granted. I respectfully dissent from this latter conclusion insofar as it upholds the attempt to obtain judicial review of the maintenance and repair policies and practices of NCHA.

As to the contention that the doctrine of sovereign immunity, as a blanket matter, precludes the exercise of jurisdiction in this case, it may be noted at the outset that the judicially developed concept of governmental immunity from suit has for a long time been under attack.[1] The Supreme Court has joined in the assault at least to the extent of from time to time adding its own pronouncements against the principle,[2] but however discredited the doctrine is considered to be by legal writers, in practice Supreme Court decisions have tended to expand its reach.[3] The result of course is a condition of hopeless confusion in judicial opinions, and an invitation to Government attorneys to assert the applicability of the doctrine whenever the opportunity reasonably presents itself.[4] A federal trial court is faced with a thankless task whenever it is called upon to decide whether the doctrine is applicable in a particular case.

It is difficult to reconcile the prior decisions on sovereign immunity on the basis of the abstract principles they announce. A close comparison of the facts in each case is the only approach that can be relied upon with any degree of confidence.[5] The appropriate inquiry then is whether the factual circumstances of this case are sufficiently similar to those

17. Judge MacKinnon refers to one named defendant as no longer in office, and there is at least one other known to us to be in the same situation, i. e., Fletcher. There may indeed be others, but this is a matter for the parties to get in hand on remand to the District Court. That is also the place where questions of jurisdiction over the person should be raised and determined in the first instance.

1. E. g., 3 K. Davis, Administrative Law Treatise ch. 27 (1958, Supp.1965); Cramton, Nonstatutory Review of Federal Administrative Action; The Need for Statutory Reform of Sovereign Immunity, Subject Matter Jurisdiction, and Parties Defendant, 68 Mich.L.Rev. 389 (1970); Scalia, Sovereign Immunity and Nonstatutory Review of Federal Administrative Action: Some Conclusions from the Public-Lands Cases, 68 Mich.L.Rev. 867 (1970); Currie, The Federal Courts and the American Law Institute (pt. II), 36 U.Chi.L.Rev. 268 (1969); Byse, Pro-

posed Reforms in Federal "Nonstatutory" Judicial Review: Sovereign Immunity, Indispensable Parties, Mandamus, 75 Harv.L.Rev. 1479 (1962); Carrow, Sovereign Immunity in Administrative Law— A New Diagnosis, 9 J.Pub.L. 1 (1960).

2. See, e. g., National City Bank v. Republic of China, 348 U.S. 356, 359–360, 75 S.Ct. 423, 99 L.Ed. 389 (1955).

3. H. Hart & H. Wechsler, The Federal Courts and the Federal System 1151 (1953); Cramton, supra note 1, at 417; Scalia, supra note 1, at 868–869. For example, compare Malone v. Bowdoin, 369 U.S. 643, 82 S.Ct. 980, 8 L.Ed.2d 168 (1962), with United States v. Lee, 106 U.S. 196, 1 S.Ct. 240, 27 L.Ed. 171 (1882), and Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949).

4. See Cramton, supra note 1, at 420–421.

5. See Scalia, supra note 1, at 918–920.

of any prior case involving the application of the sovereign immunity doctrine to require its invocation here.

Numerous attempts have been made, none with complete success, to separate sovereign immunity decisions into categories based on similar factual patterns.[6] One grouping of cases which *has* gained a degree of general acceptance as a discrete category is the class of cases seeking to in some manner dispossess the Government of property of which it is in possession or to which it holds title. The argument has been pressed that cases which fall into that category should control decision in the present case, but the majority opinion refutes that contention. The short answer, as the majority opinion makes clear, is that the relief presently sought would not interfere with the Government's title to or possession of the public housing facilities in question.

An exhaustive examination of other possible categories and their similarities and dissimilarities to the facts of the present case would extend this opinion unnecessarily. It is sufficient to say that no case has been cited by the parties to this litigation, nor has independent research disclosed any, of sufficiently comparable factual circumstances to compel a holding that the doctrine of sovereign immunity rules out the exercise of jurisdiction here. To the contrary, assuming that the complaint otherwise makes out an appropriate case for judicial review of the official action in question, this court has held that the Administrative Procedure Act renders the doctrine of sovereign immunity inapplicable. Scanwell Laboratories, Inc. v. Shaffer, 137 U.S.App.D.C. 371, 385–386, 424 F.2d 859, 873–874 (1970); *see also* IWW v. Clark, 128 U.S.App.D.C. 165, 171 n. 10, 385 F.2d 687, 693 n. 10 (1967), cert. denied, 390 U.S. 948, 88 S.Ct. 1036, 19 L.Ed.2d 1138 (1968).

However, that conclusion, rather than disposing of this appeal, only sets the stage for the real inquiry which is called for. It remains to be seen whether dismissal of the suit, insofar as it seeks to subject the maintenance and repair practices and obligations of NCHA to judicial scrutiny and control, should be upheld on the alternate ground stated by the District Court. The District Court dismissed the complaint for two reasons: (1) that the doctrine of sovereign immunity deprived the court of jurisdiction in the matter and (2) that the complaint failed to state a claim for which relief may be granted. The majority opinion characterizes the District Court's conclusion as to (2) as relying in substantial part on its conclusion as to (1), and concludes that the complaint *does* state a claim for which relief may be granted. Assuredly, the order of the District Court is typical in that it does not specify exactly why it was thought that no claim for relief was made out by the complaint, and as the court suggests the brief on behalf of HUD and the NCHA officials offers little help on this point. But in my judgment the conclusion is inescapable that a valid reason does exist for upholding the dismissal of the complaint on that basis.

Uniformly, critics of the sovereign immunity doctrine have complained of the extent to which the necessity to wrestle with the doctrine distracts the courts from the real business at hand—the inquiry as to whether for other reasons judicial review should be sharply limited or entirely withheld in the particular circumstances of the immediate case.[7] Non-reviewability issues are directed analytically to the question of whether a remedy exists "in appropriate federal courts of first instance," Stark v. Wickard, 321 U. S. 288, 316, 64 S.Ct. 559, 88 L.Ed. 733 (1943), and in appropriate instances are

---

6. *See, e. g.,* 3 K. Davis, *supra* note 1, § 27.05, at 571–576 (1958); Cramton, *supra* note 1, at 401–404; Scalia, *supra* note 1, at 880–882; Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 705–732, 69 S.Ct. 1457 (1949) (Frankfurter, J., dissenting).

7. *See* Curran v. Laird, 136 U.S.App.D.C. 280, 288–289, 420 F.2d 122, 130–131 (*en banc,* 1969).

properly for resolution at the complaint stage of litigation.[8] If it is determined that there is an absence of remedy, then the complaint fails to state a claim for which relief may be granted.

When all has been said and done, whether particular agency action is reviewable in the courts must largely depend on whether Congress intended that rights it has created be protected by judicial remedies. Stark v. Wickard, *supra*, 321 U.S. at 306, 64 S.Ct. 559. Though it remains true that as a general rule there is a presumption in favor of judicial review, *see* Abbott Laboratories v. Gardner, 387 U.S. 136, 141, 87 S.Ct. 1507 (1967), nevertheless there are exceptions to the rule, and each case must be resolved in light of its own peculiar circumstances.[9] Whether review is sought under the authority of a specific statutory provision or pursuant to a general review provision such as section 10 of the Administrative Procedure Act, the essential question is the same: Has Congress directed that judicial review be available in the particular case?[10] When Congress confers upon individuals certain rights as here, it is under no obligation to provide a remedy for infringement of those rights through the courts. *See, e. g.*, Stark v. Wickard, *supra*, 321 U.S. at 306, 64 S.Ct. 559; Lynch v. United States, 292 U.S. 571, 582, 54 S.Ct. 840, 78 L.Ed. 1434 (1934); United States v. Babcock, 250 U.S. 328, 331, 39 S.Ct. 464, 63 L.Ed. 1011 (1919); *cf.* Tutun v. United States, 270 U.S. 568, 576, 46 S.Ct. 425, 70 L.Ed. 738 (1926). Thus, it must be determined whether the right to judicial review was conferred by Congress in cases such as the present one.

To facilitate this inquiry, it is necessary to understand exactly what is placed at stake by the complaint in this case. Paragraph 9 of the complaint states that

plaintiffs contend that defendants have failed or refused to make necessary repairs in their dwellings. Defendants have failed to correct the following defects and conditions: broken windows and doors, absence of weather stripping, absence of door sills, holes and cracks in plaster, in walls, and in ceilings, defective furnaces, refrigerators and stoves, stopped-up commodes and tubs, presence of roaches and other vermin, peeling interior and exterior paint, loose and missing exterior siding, absence of heat during the winter months, water seepage and excessive dampness. Defendants have further failed and refused to maintain the common grounds of projects and have permitted the existence of abandoned automobiles, uncollected trash, broken glass, weeds and uncut grass.[11]

Paragraph 5 of the "Prayer for Relief" requests

That this Court permanently enjoin the defendants, and each of them, from failing and refusing to perform their duty to maintain and repair the premises of plaintiffs and their class in a decent, safe and sanitary condition. * * *

---

8. *See, e. g.*, International Ass'n of Machinists and Aerospace Workers, AFL–CIO v. National Mediation Board, 138 U.S.App. D.C. 96, 111, 425 F.2d 527, 542 (1970).

   Dismissal at the complaint stage is of course improper where the question of nonreviewability is necessarily "interrelated with the merits of the controversy," Peoples v. United States Dep't of Agriculture, 138 U.S.App.D.C. 291, 296, 427 F.2d 561, 566 (1970), but as will be seen this is not the case with the present litigation.

9. [E]ach statute in question must be examined individually; its purpose and legislative history as well as its text are to

be considered in deciding whether the courts were intended to provide relief for those aggrieved by administrative action. Heikkila v. Barber, 345 U.S. 229, 233, 73 S.Ct. 603, 605, 97 L.Ed. 1371 (1953).

10. *See, e. g.*, Byse & Fiocca, Section 1361 of the Mandamus and Venue Act of 1962 and "Nonstatutory" Judicial Review of Federal Administrative Action, 81 Harv. L.Rev. 308 (1967).

11. Under the lease between the parties the tenant agrees:
   "3. (g) To keep the premises and adjacent grounds in good, orderly and clean condition * * *."

The complaint *does not* allege that NCHA officials have acted in affirmative bad faith in carrying out their repair and maintenance obligations.[12] The complaint *does not* allege that NCHA officials acted arbitrarily and capriciously in their asserted failure and refusal to repair and maintain the public housing facilities in question.[13] The complaint *does not* allege that the asserted failure and refusal of NCHA officials to repair and maintain the housing facilities in question raises nonfrivolous constitutional issues.[14] The complaint *does not,* as it realistically could not, allege that NCHA officials are under an absolute statutory obligation to repair and maintain the housing facilities in question under any and all circumstances. However, the complaint *does* allege that the asserted failure and refusal of NCHA officials to carry out repair and maintenance obligations violates "the United States Housing Act * * * the District of Columbia Alley Dwelling Law * * * and the Housing Regulations of the District of Columbia. * * *" The question then is: Does an action lie in a federal district court for declaratory relief and a mandatory injunction under these circumstances, or—stated another way—does the complaint identify the case as one seeking judicial review of nonreviewable agency action?

Those portions of the complaint quoted above identify the present case as partly one for judicial review of the conformance of agency action to statutory requirements and to the requirements of regulations promulgated pursuant to statutory authority. The absence of judicially discoverable and manageable

guides to decision is, of course, one very significant factor which suggests that court review of agency action was not contemplated by Congress. *Cf., e. g.,* Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Further, unless the determination the court is asked to make is one which can be made in the "usual common-law manner," [15] the inference is strong that judicial review was not intended. This suggests as a starting point for analysis an examination of the exact language of the applicable statutory sections and regulations.

Appellants first rely on the Housing Act of 1937, 50 Stat. 888, as amended, 42 U.S.C. § 1401 *et seq.,* specifically the stated purpose of Congress to provide "decent, safe, and sanitary dwellings" [16] for low-income families. These words must, of necessity, express the general objectives of Congress in instituting a federally-assisted public housing program; they cannot have been intended to impose a fixed, absolute obligation on the part of local public housing administrators.[17] In addition, it should be noted that the quoted declarations of the statute obviously set forth broad future goals which even a cursory examination of the Act indicates were to be accomplished over a great many years.[18] All recognize that such congressional declarations are meaningless if they are not backed by adequate annual appropriations. The true intent of Congress in such cases, to the extent it can be said to be controlling on administrative officials, is thus to be garnered not solely from broad policy declarations but also from the indications that Congress gives by its current supporting appropriations.

12. *Cf.* Pence v. Tobriner, 121 U.S.App.D.C. 282, 349 F.2d 717 (1965); Barger v. Mumford, 105 U.S.App.D.C. 188, 265 F. 2d 380 (1959).

13. *See* Gonzalez v. Freeman, 118 U.S.App. D.C. 180, 185, 334 F.2d 570, 575 (1964).

14. *See* Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920, 929–930 (2d Cir. 1968).

15. Attorney General's Comm. on Administrative Procedure in Government Agen-

cies, S.Doc.No.8, 77th Cong., 1st Sess. 80–81 (1941).

16. 42 U.S.C. §§ 1401, 1402(1), 1402(2).

17. *Cf.* Rosado v. Wyman, 397 U.S. 397, 413, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); Dandridge v. Williams, 397 U.S. 471, 476–481, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

18. *See* S.Rep.No.84, 1949 U.S.Code Cong. Serv. pp. 1550, 1558–1560.

To the extent that its appropriations are inadequate to carry out a declared policy, no clear duty can be said to be imposed upon the administrative officials to accomplish all the stated objectives of the program; in such circumstances such administrators may be forced by the realities of limited resources into making alternative judgments.[19] Viewed in this light, the statutorily expressed intention of Congress provides little if any guidance to a court faced with the problem of determining whether day-to-day administrative implementation in a specific instance is or is not consistent with the statutory mandate.

Reliance is also placed on the District of Columbia Alley Dwelling Act, D.C. Code § 5–103 *et seq.*, under which NCHA is constituted as a local housing authority for purposes of the Housing Act of 1937. Pursuant to the terms of the Alley Dwelling Act, there exists between NCHA and HUD a "Consolidated Annual Contributions Contract." Under that contract, NCHA is again obligated to provide "decent, safe, and sanitary dwellings" but in addition there is the obligation to "maintain each Project in good repair, order and condition." Although the language "good repair, order and condition" may add something to the meaning of "decent, safe, and sanitary," it does not add much. Both phrases are extremely general in terms, and are of little help in deciding concrete cases.[20]

Most importantly, it is asserted that the provisions of the District of Columbia Housing Code are applicable to public housing owned by the United States and operated by NCHA, and that these regulations provide precise standards by which to judge the adequacy of NCHA's repair and maintenance activities. Doubtless this is true *if* the Housing Code is

applicable to low-income public housing in the District, but that conclusion is unwarranted. The opinion for the court finds it unnecessary to decide the question, but to my mind the correct resolution of the nonreviewability issue requires decision of that question.

In United States v. Wittek, 337 U.S. 346, 69 S.Ct. 1108, 93 L.Ed. 1406 (1949), the Supreme Court held that the District of Columbia Emergency Rent Act, 55 Stat. 788 (1941), was inapplicable to Government-owned defense housing in the District of Columbia, partly because a contrary result would have required the Court to "hold it [Emergency Rent Act] applicable also to the United States as the landlord of low-rent housing." 337 U.S. at 358, 69 S.Ct. at 1114. Although the holding in *Wittek* by itself does not resolve the question at hand, the Court there did indicate the nature of the inquiry which must be made: "The text, surrounding circumstances and legislative history of this District Act neither express nor imply a change in the authority already vested in permanent federal agencies in their management of the Government-owned housing in the District." 337 U.S. at 359–360, 69 S.Ct. at 1115.

As the opinion of the panel majority notes, the same Congress that enacted the D.C. Alley Dwelling Act also authorized the D.C. government to promulgate the D.C. Housing Code regulations. The opinion then concludes that since the applicability of the regulations would be consistent with the objective of providing "decent, safe, and sanitary dwellings" Congress probably could not have consciously rejected the notion that public housing in the District should be subject to the regulations, although the opinion does not decide the question. Yet there are persuasive reasons why Congress

---

19. The legislative history of the Housing and Urban Development Act of 1968, Pub. L. 90–448, 82 Stat. 504, gives explicit recognition to problems of this nature: "Progress [in the housing program] has been repeatedly interrupted by periods of tight money and budgetary pressures on the Federal Government."

H.R.No.1585, 1968 U.S.Code Cong. & Adm.News, p. 2873.

20. *See generally* Cahn & Cahn, The New Sovereign Immunity, 81 Harv.L.Rev. 929 (1968).

might not have intended any such result, and in fact did not intend such a result.

Congress, in implementing social welfare programs, sometimes proceeds explicitly "upon the premise that public bodies organized as nonprofit agencies to perform a public purpose could be entrusted with the responsibility of conducting their operations in the best public interest." [21] It is not at all unlikely that Congress would have the same thought in mind without explicitly saying so in the course of enacting social welfare legislation such as the Alley Dwelling Act.[22] Congress with good reason may well have thought the NCHA and its predecessors did not present the same need for official scrutiny and regulation as did private landlords.

That Congress did not intend that NCHA be subject to the Housing Code regulations seems clear. D.C.Code § 5–103(c), 48 Stat. 930 (1934) explicitly requires that construction, alteration or demolition by NCHA "be in accordance with the laws and municipal regulations of the District of Columbia." Thus when Congress has intended that the property of the United States be subject to District of Columbia regulation, it has explicitly so stated. As the Supreme Court noted in *Wittek, supra,* the operation and management of public housing in the District of Columbia was placed by Congress "in the control of a national or presidentially designated authority or official with authorization fitted to the particular and various purposes of that housing." 337 U.S. at 356, 69 S.Ct. at 1113. There would be no reason for Congress to assume that NCHA would be so deficient in implementing the policies of the Housing Act of 1937 and the Alley Dwelling Act that parallel supervision by another governmental agency would be necessary. This conclusion is supported by D.C. Code § 5–115, which provides generally for the cooperation of the District of Columbia government in effectuating the goals of the Alley Dwelling Act,

and which authorizes the District and its instrumentalities to:

"(f) Enter into agreements with the Authority [NCHA] respecting the elimination of unsafe, insanitary, or unfit buildings.  \*  \*  \* "

An authorization to enter voluntary agreements for the purpose with NCHA is obviously inconsistent with an intention that District instrumentalities exercise a power to impose regulations designed to eliminate "unsafe, insanitary, or unfit buildings."

Even if the Housing Code regulations are not directly applicable to public housing in the District, appellants assert that indirectly the regulations can be resorted to by the court, as a gloss on the statutory standard of "decent, safe, and sanitary dwellings," to provide the necessary guidance to judicial decision-making. However, as pointed out above, the threshold inquiry is whether Congress intended that judicial review be available, and that determination must revolve in significant part around the question whether there exist congressionally furnished guides to decision. It is clear to me that such guidelines do not exist and that conclusion of itself comes close to disposing of this part of the case. The brief for appellants at p. 26 recognizes this, by admitting that "[t]his action is limited to ensuring compliance with specific standards of safe and sanitary housing.  \*  \*  \* " However, even absent congressionally furnished standards, if for other reasons it should clearly appear that Congress intended that a judicial remedy be available in the context of this case, *then* it might be proper for a court to resort to the Housing Code regulations for guidance. The question then recurs, did Congress intend that there be judicial review of NCHA's day-to-day maintenance and repair practices?

In addition to the absence of congressionally supplied guides to judicial decision, there are other reasons for concluding that judicial review was *not* in-

21.  S.Rep.No.1656 to accompany H.R. 7664, p. 4, 83d Cong., 2d Sess. (1954).

22.  *Cf., e. g.,* Cappadora v. Celebrezze, 356 F.2d 1, 6 (2d Cir. 1966).

tended by Congress. First, there is the fact—adverted to briefly by the majority opinion—that Congress has explicitly conferred upon HUD responsibility for overseeing the operations of local housing authorities, including NCHA. Through the "Annual Contributions Contract," HUD has the obligation to exert pressure on NCHA to secure its compliance with the contract and with the goals of "decent, safe, and sanitary dwellings." To aid in implementing these goals, statutory authority is conferred on HUD to make "such rules and regulations as may be necessary to carry out" federally-assisted low-rent housing programs. Housing Act of 1937, § 8, 50 Stat. 891, as amended, 42 U.S.C. § 1408. *See* Thorpe v. Housing Authority, 386 U.S. 670, 673 n. 4, 87 S.Ct. 1244, 18 L.Ed.2d 394 (1967) (per curiam). Thus if NCHA or any local housing authority fails to meet its obligations, HUD has several alternative remedies. It can reduce or terminate the annual federal contributions,[23] increase the interest rate on loans or declare them in default,[24] or even assume the management of a project.[25] It is argued that HUD is either unable or unwilling to make effective use of these sanctions, but even assuming that is the case the fact remains that this is man-

agement machinery established by Congress which involves the exercise of a high degree of discretion, and its existence suggests that Congress did not intend that the machinery of the courts be available to superintend the day-to-day implementation of the low-income public housing program. If the sanctions available to HUD to induce compliance with the goals of the housing program are unsatisfactory, and if implementation of those goals by administrators falls short of what Congress has directed, it is presumably for Congress to take appropriate action to remedy the defects in the administration of the program.[26]

Second, there is the nature of the official action sought to be reviewed. Whatever the amenability of purely regulatory agency action to judicial scrutiny, the problems are entirely different when the official action in question consists of "running, evaluating, and regulating enterprises simultaneously."[27] Courts are ill-suited to engage in overseeing day-to-day activities of a judgmental and all-encompassing nature, such as the repair and maintenance practices followed by public housing administrators in specific cases. Such activities have traditionally been viewed as beyond the reach of the courts.[28]

23. 42 U.S.C. § 1415(3).

24. *Id.* § 1415(1).

25. *Id.* § 1413(a).

26. Congress has indicated a continuing interest in questions of this sort, and has expressed the intention to take legislative action in response to problems as they are revealed. The Housing and Urban Development Act of 1968, § 5, 82 Stat. 477, provides:

"The Secretary [of HUD] shall, as early as practicable in the calendar year 1969 and in the calendar year 1970, make a report to the respective Committees on Banking and Currency of the House of Representatives and the Senate identifying specific areas of program administration and management which require improvement, describing actions taken and proposed for the purpose of making such improvements, and recommending such legislation as may

be necessary to accomplish such improvements."
Section 110 of the same Act, 82 Stat. 497, sets up a National Advisory Commission on Low Income Housing, and § 110(b) (1) provides as follows:

"The Commission shall undertake a comprehensive study and investigation, to further the policy set forth in section 2 of this Act, of practicable and effective ways of bringing decent, safe, and sanitary housing within the reach of low income families. Such study shall evaluate existing housing programs designed to assist such families, and explore new ways by which public and private resources may be more effectively utilized in meeting the housing needs of such families."

27. Cahn & Cahn, *supra* note 20, at 969.

28. *See generally, e. g.,* Cramton, *supra* note 1.

Finally, there is the very important consideration that courts should not be overburdened with an onslaught of litigation seeking review of administrative action.[29] Where a decision in favor of reviewability would have the effect of substantially increasing the workload of the courts, it is not to be lightly inferred that Congress intended such a result. If every asserted failure to promptly and adequately repair and maintain public housing facilities is to be subject to review in the courts, there can be little doubt that a potential for extensive recourse to the federal courts exists. That circumstance militates against a conclusion that judicial review could have been intended by Congress in the circumstances of this case.

It is thus my judgment that insofar as the complaint in this case seeks judicial review of the maintenance and repair practices of NCHA, and declaratory relief and a mandatory injunction to control those practices, it fails to state a claim for which judicial relief may be granted. The remaining parts of the complaint however stand on a different footing. The complaint also seeks a declaratory judgment that the asserted failure to repair and maintain the housing facilities is a breach of the lease contract between tenants of the facilities and NCHA, and a breach of the "Consolidated Annual Contributions Con-

tract," under which the appellants are entitled to sue as third-party beneficiaries. Also, the complaint seeks a declaration that certain charges for excess utility use violate specific statutory and regulatory requirements and are accordingly illegal.[30] The complaint in these respects presents issues traditionally resolved by the courts, and thus states a claim for which judicial relief may be granted. I would thus remand the case to the District Court for investigation of the merits of these claims only.

In my view the action should also be dismissed as against Elder Gunter, formerly Deputy Assistant Secretary of Housing Assistance, Department of Housing and Urban Development, because of his resignation; and the return of the service of summons quashed as against Warren P. Phelan and Vincent A. Marino, respectively, Regional and Assistant Regional Administrators, of the Department of Housing and Urban Development, because they have their residences and offices in Philadelphia and are not subject to service of process in the District of Columbia. Fed.R.Civ.P. 4, 25. The United States District Court in the District of Columbia, unless specially provided, does not have jurisdiction of a suit against a person "who is not resident or found within the District." D.C. Code § 11–521.

---

29. *See* Rosado v. Wynn, 397 U.S. 397, 435, 90 S.Ct. 1207 (1970) (Black, J., dissenting); Saferstein, Nonreviewability: A Functional Analysis of "Committed to Agency Discretion," 82 Harv.L.Rev. 367, 371 (1968).

30. Under the lease the tenant agrees: "3 (h) * * * to pay, *as additional rent when billed,* charges for utilities used in excess of established allowances * * *." For non-payment of such charges NCHA proceeds in court by way of eviction. Appellants assert that failure to provide an "administrative hearing" in such cases is

a denial of due process. NCHA by uncontested affidavit asserts that prior to institution of eviction proceedings the tenant is notified of the proposed action; the reason therefor and given an opportunity to make response. Only after a failure to respond or to justify alternative arrangements is the matter referred to court where the tenant may interpose any defense permitted by law and have a regular judicial trial. Under such circumstances, to my view, the requirements of due process are fully satisfied. Whether the charges made for utilities were excessive is another question.